441 So.2d 239 (1983)
SAUVE HEIRS, INC.
v.
REYNAUD CONSTRUCTION CO., and John D. Reynaud, Jr.
No. CA 0631.
Court of Appeal of Louisiana, Fourth Circuit.
October 6, 1983.
Rehearing Denied December 21, 1983.
*241 Donald A. Meyer, Shushan, Meyer, Jackson, McPherson & Herzog, New Orleans, for defendant-appellee.
C. Ellis Henican, Henican, James & Cleveland, New Orleans, for plaintiff-appellant.
Ralph L. Kaskell, Jr., Deutsch, Kerrigan & Stiles, New Orleans, for third-party defendant-appellee J.J. Krebs & Sons, Inc.
William J. Wegmann, Sr., Frederick R. Bott, Patricia Maureen Joyce, Deutsch, Kerrigan & Stiles, New Orleans, for third-party defendant-appellee J.J. Krebs & Sons, Inc.
C. Murphy Moss, Jr., and George E. Cain, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for third-party defendant-appellee Commonwealth.
Before REDMANN, SCHOTT and CIACCIO, JJ.
SCHOTT, Judge.
This is an action for damages for fraud allegedly committed in the sale of real estate from defendant, Reynaud Construction Company, Inc., to plaintiff, Sauve Heirs, Inc. Alternatively, plaintiff seeks compensation based upon mutual error in the contract of sale. Also joined as a defendant was John D. Reynaud, Jr. based on an indemnification agreement. This appeal is from the trial court's dismissal of plaintiff's case. The issues are whether plaintiff is precluded from recovering because a levee over a substantial part of the property it purchased constituted an apparent servitude in accordance with Richmond v. Zapata Development Corp., 350 So.2d 875 (La. 1977), and if not, whether the facts support plaintiff's position based on either fraud or mutual error. Other potential issues include the proper measure of damages, the liability of a surveyor, J.J. Krebs & Sons, as third party defendant, and the liability to Krebs of Commonwealth Land Title Insurance company, on third party demand.
The sale in question was confected on December 10, 1973, and transferred title to a number of lots in Sections 2 and 3 of Lake Trail Subdivision in Jefferson Parish as well as Parcel A, which is the focal point of this controversy. All the property was described as follows:
"Parcel "A" of Section III, which said Parcel "A" contains 3.468 acres and measures 179.70 feet front on 45th Street and a first depth of 4.68 feet along its line common to Lot 171, Square 13, Section III, by a second depth along the line adjoining Lot 171 of 204.17 feet and by a third depth along the westerly line of the subdivision of 555.56 feet and a depth on the opposite sideline (David Drive side) of 740.72 feet, with a width in the rear of 255.48 feet."
According to the survey Parcel A is clearly located between 45th Street on the south and the right of way of the Pontchartrain Levee District on the north.
Following the purchase plaintiff sold all the property except Parcel A and four lots just south of it to Don Villarubia, who was to construct a bridge over the canal at 41st Street and cut Lake Trail Drive up the middle of the subdivision to Parcel A. As he was doing this work on September 30, 1974, he discovered that the Lake Pontchartrain levee was located on Parcel A. He reported this to the plaintiff's principals, Charles McHale and Frank Spalitta, who in turn discovered that the southern boundary of the levee right of way was the northern *242 side of 45th Street, so that Parcel A was wholly within the right of way and was virtually useless to plaintiff.
The subject sale was not a typical one, but, instead, was the culmination of a joint project launched by the parties in June, 1972. A proper understanding of the issues requires a discussion of this background. Plaintiff had held title to a forty-two feet wide strip of land stretching almost two miles from Interstate 10 Highway in Kenner toward Lake Pontchartrain. Defendant had an option to purchase an adjacent Tract X measuring about 185 feet wide. Both parties recognized the advantage of combining the properties for the purpose of a residential subdivision since neither property standing alone could be developed economically. The agreement they reached in June, 1972, provided for plaintiff to convey to defendant the Sauve tract and for defendant to purchase Tract X. Defendant would obtain from the governmental authorities approval of a subdivision of the property consisting of Section 1 between 31st Street and West Esplanade Avenue, Section 2 between West Esplanade and 41st Street, and Section 3 from 41st Street to Lake Pontchartrain, and upon completion of the development defendant would retain Section 1, plaintiff would get Section 3, and the parties would divide the lots in Section 2. The transfer of the property allotted to plaintiff would be for one-half the costs expended by defendant in the acquisition and development of the tract.
Although the basic concept seemed clear when the time came for defendant to convey to plaintiff its share of the project differences developed which took several months of difficult negotiations to resolve. However, in November, 1973, the parties finally entered into an agreement to purchase which spelled out exactly what lots plaintiff would take from Section 2 along with the whole of Section 3 and what price would be paid by plaintiff. In the agreement to purchase as in the act of sale Parcel A was included by the description given above.
When McHale and Spalitta contacted Krebs about Parcel A being within the levee right of way they were informed that in October, 1972, defendant's attorneys, Louis Graham and J.B. Kiefer, had been sent a perimeter survey of the property which specifically showed the southern boundary of the right of way to be on the north side of 45th Street. This survey also showed a title problem on the western side of Section 3 consisting of a substantial encroachment on several lots in the northwest corner of Section 3.
According to Graham and Kiefer they never saw this survey but they were told of the title conflict and were shown a tracing in Krebs' office showing the conflict but not the southern boundary of the right of way. They immediately studied their title files along with abstracts of the neighboring properties and concluded that there was no encroachment. They so informed Krebs and asked that the encroachment's designation be removed. The survey was revised to delete the encroachment, but it still showed the southern boundary of the right of way to be at the north line of 45th Street. According to Krebs this corrected perimeter survey would have been sent to Reynaud, Graham and Kiefer, but they all denied having seen this survey.
In any event this perimeter survey dated October 24, 1972, was revised in July, 1973, to show the lots, squares, and streets of the subdivision in Sections 2 and 3. The last lots on the north side of Section 3 were shown to be at 45th Street. However, this revised survey incredibly omitted the southern boundary of the Pontchartrain Levee right of way. Instead, the survey indicated the presence of a viable, useful, and valuable piece of property designated as Parcel A located between 45th Street and the levee right of way line, ostensibly the southern boundary line but in actuality the northern boundary.
Plaintiff's case of fraud against defendant is based on the theory that Reynaud, Graham and Kiefer all knew there was no Parcel A, that this information had been disclosed by the earlier Krebs' surveys, and *243 that they covered up this information and deceived plaintiff into believing it was getting Parcel A in the December act of sale based on the misleading latest Krebs survey. Alternatively, plaintiff contends that all parties were in error as to the existence of Parcel A, and since this was a principal cause for the contract plaintiff is entitled to compensation for the deficiency in the property it received.
The trial court found that plaintiff, through McHale and Spalitta, was on notice of the existence of the levee and should have conducted an examination to determine its location before the sale. The court reasoned that McHale's and Spalitta's discovery that the levee covered Parcel A in 1974 would have occurred before the sale had they but visited the property by walking westward along the levee from Williams Boulevard to the property. The court thus concluded that the levee was an apparent servitude against which the vendor's warranty was inapplicable as in Richmond v. Zapata Development Corp., supra.
The record does not support this conclusion. In the Richmond case there were "extensive mineral recovery operations" being conducted on 360 acres of a 640 acre tract consisting of "a network of pipelines, tanks, lines, canals, structures, shacks, offices, houses, drilling equipment, rigs, both active and abandoned, roadways and other earthen works, ponds, pits, oil spills and pollutants." The court concluded at page 880 that:
".... just as an apparent servitude, an undisclosed mineral lease which produces on the property ample signs of its existence is a real charge of which it is the buyer's business not to be ignorant and against which he cannot claim warranty." Richmond v. Zapata Development Corp., supra at P. 880.
However, in the instant case the undisclosed levee right of way on Parcel A did not produce "ample signs of its existence." This property was two miles long and none of the paper subdivision streets had been physically cut in Section 3 before the sale was passed. The record is not clear as to where the closest cross road through the property was located, but an aerial photograph indicates the presence of a canal running across the property at 41st Street with a road alongside. This appears to be about 2800 feet, or more than half a mile, south of the levee right of way. According to the Krebs plan this 2800 feet would accommodate lots in squares bounded by 41st, 42nd, 43rd, 44th and 45th Streets and would leave an additional 700 feet of depth to accommodate Parcel A before the right of way line was reached. Thus, the trial court charged plaintiff's agents with the knowledge that, as they stood on the levee and looked south, there was only some 2800 feet of distance across this heavily wooded area to the canal, which no evidence shows would have been visible in any event, rather than some 3500 feet which the plan called for. To place such a burden on this purchaser would be unreasonable.
This conclusion is analogous to the one we reached in Powell v. Department of Highways, 383 So.2d 425 (La.App. 4th Cir. 1980) writs refused, La., 389 So.2d 1129. There the Highway Department constructed a fence twenty-five feet beyond its right of way on plaintiff's property. The argument was that prescription began to run against plaintiff when the fence was built because plaintiff was then charged with the duty of discovering that the fence's actual location was beyond that shown on the Department's plan prepared when it purchased the right of way from plaintiff twelve years earlier. In rejecting the Department's argument we observed at page 428:
".... There is no evidence to show that any of the property adjacent to or in the vicinity of plaintiff's land was occupied or developed so that plaintiff had no reasonable point from which to measure or discover that the Department placed the fence in the wrong location."
Having concluded that the trial court was in error in dismissing plaintiff's suit on the basis of the Richmond case we must now grapple with the issues of fraud and mutual error. As to fraud, plaintiff had the heavy burden of establishing it by exceptionally *244 strong proof beyond a mere preponderance of the evidence. LSA C.C. Art. 1847, Hall v. Arkansas-Louisiana Gas Co., 368 So.2d 984 (La.1979), modified, other grounds 453 U.S. 571, 10 S.Ct. 2925, 69 L.Ed.2d 856 (1981) Josephs v. Austin, 420 So.2d 1181 (La.App. 5th Cir.1982), writ den. La., 427 So.2d 870. The record does not reflect that plaintiff met that burden.
Reynaud was an experienced developer. Graham and Kiefer were attorneys specializing in real estate title work and agents for the title insurance company which was to insure plaintiff's title to Parcel A. It seems incongruous that these individuals never saw the first Krebs survey which showed the encroachment on the northwest corner of Section 3 and the levee right of way line running along the north side of 45th Street. This is especially so when we consider that one A.J. Goubler, an associate of the law firm of Messrs. Graham and Kiefer, wrote to Krebs for the law firm on October 23, 1972, making specific reference to the survey in the context of requesting that the conflict in the northwest corner be removed from the plan "as discussed with you by Mr. Graham and Mr. Reynaud."
In this court plaintiff argues that defendant's failure to call Goubler as a witness creates a presumption that his testimony would have been adverse to defendant. However, he was no longer associated with the law firm at the time of the trial and he was equally available as a witness for either party. See Crandall v. Scott, 350 So.2d 922 (La.App. 4th Cir.1977). The application of this rule of adverse presumption for failure to call a witness is particularly troublesome in this case not only because Goubler was available to both sides but also because plaintiff had the resources and the time to interview him and even take his discovery deposition to determine whether his testimony would have been favorable. In speculating on his testimony it is not unlikely that he would have supported the position taken by his former associates and that he would not have incriminated himself along with them. Furthermore, this rule must be tempered by the proposition that a party to a lawsuit needs only to prove his case. If he does so by calling one or more witnesses to testify concerning an issue he should not be penalized because he fails to call still another witness on the subject. On the other hand, the opposing party should not be allowed to sit back and take no action to produce a witness to a transaction and use that witness's absence as mute refutation of the positive testimony of the adverse witnesses who did testify. Finally, since we are here dealing with the serious charge of fraud, we are unwilling to accept defendant's failure to call Goubler as sufficient proof considering the unequivocal testimony of Reynaud, Graham, and Kiefer, the factors we have already discussed, and the circumstances surrounding plaintiff in this case.
When plaintiff began negotiating with defendant on this project in June, 1972, McHale and Spalitta were in possession of two surveys showing the Sauve tract and Tract X, one by Fontcuberta dated September 12, 1963, and the other undated, by Schuman. Both show the south boundary of the levee right of way to be coextensive with the north boundary of 45th Street. This is obvious to a lay person and it was so testified to by plaintiff's expert witness, Louis Bisso. Surely it had to be known to McHale and Spalitta who were experts in land titles. But if the maps themselves did not establish this fact the description of the Sauve tract in the June, 1962, agreement dispels any doubt for it makes reference to the attached Schuman survey and reads in pertinent part from a beginning point on the south end of the tract as follows:
".... thence in a northerly direction 10,615".... to its intersection with the right of way of the Lake Pontchartrain Protection Levee; thence along the right of way of the Lake Pontchartrain levee 105' more or less to a point, said point being on the westerly line of the property...."
When the Schuman survey and this description are compared to the Krebs survey available to McHale and Spalitta before the act of sale the conclusion is inescapable that *245 Parcel A was indeed located in the right of way.
It is likewise significant that the Sauve tract was sold by plaintiff to defendant with warranty and part of the property sold back to plaintiff by defendant was the same property. Plaintiff now takes the anomalous position that it was supposed to get back something beyond that which it had in the first place.
We have made these observations in the context of dealing with plaintiff's charge of fraud against defendant. We have concluded that these circumstances make plaintiff's position as to fraud untenable, but we do not reach the same conclusion on the issue of error. Had Reynaud, Graham, and Kiefer testified that they knew as should McHale and Spalitta have known that Parcel A was within the right of way the result would have been obvious. Plaintiff's suit could be dismissed without any difficulty. We could conclude that everyone knew Parcel A was burdened with the levee, but it was included for reasons known only to the participants. But Reynaud, Graham and Kiefer doggedly and repeatedly testified that they didn't know. On the contrary, they took the latest Krebs survey at face value and included Parcel A with the property conveyed to plaintiff. As to McHale and Spalitta, it seems that they forgot what they had conveyed to defendant and what was obvious from the Schuman survey. With the passage of time and after months of hard bargaining and difficult negotiations with Reynaud over what property would be conveyed back to plaintiff they were misled by the Krebs survey into believing that there was a Parcel A. The stage was set for a classic mutual error of fact which is defined as that which proceeds from a mistaken belief in the existence of that which has none. C.C. Art. 1821.
C.C. Art. 1823 provides that for an error to invalidate a contract it must be on some point which was a principal cause for making the contract. According to McHale and Spalitta they were particularly interested in obtaining Parcel A because of its potential for commercial development. McHale testified that he never would have engineered this transaction had Parcel A not been available. On the other hand, Reynaud testified that he never even considered Parcel A in dealing the property to plaintiff. He claimed that the price of $402,000 paid by plaintiff was based upon a cost per square foot of the lots sold to plaintiff and Parcel A was assigned no value in these computations. Thus, he contends that the Parcel could not be a principal cause for the sale. The flaw in the argument is that no matter how unimportant he thought Parcel A was, it was so important to McHale and Spalitta that they would never have gone through with the purchase without it. Had the parties known there was no Parcel A this particular contract would never have been made. Perhaps Reynaud could have dealt additional lots to plaintiff to induce it to pay $402,000 or perhaps the sale would have fallen through with defendant keeping everything including the near worthless Parcel A. But in either case the mutual error regarding Parcel A was necessarily a principal cause for both sides making the contract at issue and plaintiff is entitled to some relief.
The next, and perhaps most difficult, issue is the amount to which plaintiff is entitled. Plaintiff did not, and indeed, could not seek rescission of the sale, for by the time the error was discovered a substantial part of the property had been sold to a third party, Villarubia. Plaintiff sought to prove entitlement to the market value of a fictitious unencumbered Parcel A through the testimony and appraisal of various real estate sales experts. The law does not support this approach. Instead, the matter is controlled by C.C. Art. 2514 which provides as follows:
"Partial eviction, proportionate restitution of price.
If in case of eviction from a part of the thing, the sale is not canceled, the value of the part from which he is evicted, is to be reimbursed to the buyer according to its estimation, proportionably to the total price of sale."
*246 This article has been construed to mean that in the case of a partial eviction the buyer is relegated to an action against the seller for reimbursement of a proportionate amount of the purchase price. Collins v. Slocum, 317 So.2d 672 (La.App. 3rd Cir. 1975), writs refused (La.), 321 So.2d 362-364; Harville v. Campbell, 221 So.2d 273 (La.App. 2nd Cir.1969); O'Reilly v. Poche, 162 So.2d 787 (La.App. 4th Cir.1964). Unfortunately the statement of the law is quite simple compared to its application to the facts of this case. The task is to determine what portion of the purchase price is to be assigned to Parcel A in the fictitious unencumbered state the parties thought it was in. Plaintiff contends it played a great part in the price while defendant contends that little or no part of the price was assigned to it. The truth is somewhere in between.
Defendants take the position that the obligations of the parties can be determined from the initial agreement of June 14,1972, which provided the basic underlying "philosophy" to be followed as the project was developed. Plaintiff insists that this agreement was ultimately amended by negotiation and was replaced by the agreement to purchase of November 20,1973, and the act of sale of December 10, 1973. The record supports plaintiff's position.
The June, 1972, agreement contained the following provisions:
1. Once defendant corporation acquired Tract X and the Sauve tract it was required to develop the property into a subdivision including the installation of all off site improvements in Sections 1 and 2. Upon acceptance of same by the City of Kenner and the Parish of Jefferson defendant was to convey to plaintiff certain portions of the property.
2. The price was to be computed by adding defendant's costs for the acquisition of Tract X less the sum paid by plaintiff for the Sauve tract to defendant's cost of the off site improvements in Section 2 only and its expenses for financing, certain attorney fees, title insurance premiums, engineering, costs incurred in the resubdivision procedure, the cost incurred in the acquisition of a closed street on the west side of the subdivision, property taxes, and some other miscellaneous matters. Upon determination of such costs and notification to plaintiff of same, it was to take title to its share of the property for one half of such total costs to be paid in cash.
3. The property was supposed to yield 120 lots in Section 1, 120 in Section 2, and 80 in Section 3 and defendant was to retain Section 1 with plaintiff acquiring Section 3. Defendant was to make available to plaintiff lots in Section 2 so that each party would "have the right to have and to hold one-half of the total resubdivided lots" with the choice of lots given to defendant. Special treatment was given to certain corner lots in Sections 1 and 2. Sauve was granted an option to purchase these at $2.00 per square foot within one year after governmental acceptance of the subdivision provided plaintiff took them all. Additionally, defendant would tender half of the sixteen corner lots in Section 2 under the overall terms of the agreement. However, defendant had "the right to retain up to fifty (50) lots situated in Section 2 (except the sixteen (16) corner lots aforesaid) at the exclusive choice and selection of Reynaud, of those lots which Sauve would otherwise be tendered title to at the sum of Five Thousand and No/100 Dollars ($5,000.00) per lot less the cost which Sauve would be required to pay in accordance with the formula hereinabove set forth. In such event, Reynaud will only be required to deliver the balance of the lots remaining upon the payment of one-half (½) of the costs for same being paid by Sauve pursuant to the procedure hereinabove recited."
4. The "costs" were to be "computed on a per square footage basis and the formula is to be interpreted in its application herein in this manner so as to arrive at the total cost" as summarized under No. 2 above.
The agreement could not be implemented as written for several reasons. The original plan of subdivision of Section 2 called for lots with fifty feet of frontage but this was rejected by the city with the result that *247 there were only 113 lots in the section including the corners. Thus there were not fifty lots available to defendant under its option to purchase. In addition, defendant never developed Section 1 as the agreement required. Finally, the parties had considerable difficulty agreeing to the total costs which would set the price in accordance with the agreement. Nevertheless, they did agree that the object was to divide the property equally and for plaintiff to pay half the agreed costs to defendant. Months of negotiations ensued culminating in an agreement for plaintiff to take all of the frontage on West Esplanade Avenue in Section 1 (243.8 feet), 24 lots in Section 2, including eight corner lots, and all of the property north of 41st Street, i.e., Section 3 and Parcel A. While there is no question about the ultimate price of $402,100 there is a serious dispute over what that price represents.
According to defendant the price was arrived at by determining the cost per square foot of acquiring and developing the property using a generally agreed upon cost figure of $1,035,417, dividing it by the total square footage of 2,135,617 in the entire subdivision including streets but excluding Parcel A, and yielding .48 per square foot. This in turn was multiplied by 807,333.7 square feet consisting of the property sold to plaintiff exclusive of streets and exclusive of Parcel A. The ultimate price of $402,100 was arrived at with the addition of interest incurred because of plaintiff's delay in taking title. From these figures defendant contends that Parcel A was never considered as having any value and played no part in the price so that plaintiff's subsequent discovery that it had no value does not support any award of damages.
On the other hand, Spalitta flatly rejected the notion that square footage played any part in the ultimate settlement. He maintained that he was concerned with getting specific lots and had in his mind a sound figure of $400,000 as a settlement figure on the costs. McHale produced original notes he took at the final negotiations and testified from them that the parties had long abandoned the square footage approach. He explained that numerous conflicts had developed which caused the June, 1972, agreement to become inoperable. Among others, defendant could not develop Section 1 so that plaintiff's obligations under that agreement were never triggered. Instead the parties were negotiating over lots and dollars and they ultimately agreed on the figure of $400,000. This figure was reduced by a $2400 bill defendant agreed to pay for engineering services in Section 3 and increased by $4500 which plaintiff agreed to pay for light standards and yielded the figure of $402,100.
We resolve this conflict in favor of plaintiff and find as a fact that these parties intended to make an overall settlement on a fifty-fifty basis so that the ultimate result was for plaintiff to receive half of the subdivision and to pay half the cost which the parties agreed to be $400,000. The remaining problem is to determine how much is due plaintiff for Parcel A which was included in its half and which was thought to be worth something but which, for all practical purposes, is worthless and practically nonexistent.
The first point to be clarified on this subject is that plaintiff is entitled not to the whole price of Parcel A but only half of the price. If A sells ten lots of equal value and size to B for $10,000 and the parties later discover that two of the lots are useless because of an encumbrance B may recover $2,000 from A. But if A and B hold the same ten lots, seek to divide them equally, and subsequently determine that two of B's five lots are useless because of an encumbrance, B may recover one more lot or the price thereof. Thus, whatever value or price we find Parcel A to have, plaintiff is to recover fifty percent thereof.
The record makes it difficult to arrive at a conclusion and we have considered the possibility of a remand for this purpose as suggested by defendant. However, we have concluded that substantial justice can best be served by our arriving at a definite figure rather than relegating the parties to another round of protracted, expensive litigation *248 with attendant expert witness fees to be paid by the parties.
The record shows that Section 2 yielded 729,864 square feet of lots (according to defendant exhibit R-11) or 113 lots averaging 6459 square feet per lot. In the development of this section defendant incurred engineering fees of $7296.95, off site improvement costs for paving, sewerage and water of $297,821.20; and electric distribution costs of $45,431.65, or a total of $350,549.80. Thus, the development cost per square foot for the developed land was .48, a figure which seems to have been accepted by both parties. Louis Bisso presented plans for the development of Parcel A (plaintiff's exhibits Nos. 31 and 31C) which would yield 16 lots totaling 127,233 square feet, so that the cost of development at .48 per square foot would be $61,072.00. The testimony is fairly uniform that when the parties were dealing lots to each other they worked on the assumption that the lots were worth one dollar per square foot except for corner, commercial lots. Thus, Parcel A was worth $127,233.00 less the development cost of $61,072.00 or $66,161.00. Allowing a slight premium for location close to the lake we increase this figure to $70,000.00 and award plaintiff its half, or $35,000.00.
One inequity remains for correction. Although Parcel A is unusable for development and therefore not suitable for the purpose intended by the parties it has some speculative value. Since we have compensated plaintiff for its full proportionate price (or the value of, say, eight other lots, plaintiff would presumably have received in a 50-50 split had the parties known the true condition of the sixteen lot equivalent of Parcel A), title to the parcel should remain in both parties. Surely, had they known about Parcel A's true condition when they made their partition the logical option for them would have been to divide Parcel A or hold it in indivision. Consequently, we will recognize the parties as owners of the parcel in indivision leaving them to work with or divide it as they see fit.
Because of the result we have reached plaintiff has no cause of action against John D. Reynaud, Jr. under the indemnification agreement of June, 1982. We have attempted to correct an error in the ultimate contract between plaintiff and defendant corporation when they divided up or partitioned the property. The corporation was the sole beneficiary of the error and it alone must make the adjustment. Surely, the parties never contemplated such a result when the indemnification agreement was made.
Defendants' third party demand against J.J. Krebs & Sons, Inc. must next be considered. In the prayer of the third party petition defendants sought indemnification for whatever they may be cast in judgment to plaintiff together with attorney fees they incurred in the defense of this suit. Defendants are not entitled to indemnification because the amount awarded to plaintiff is no more than what they would have dealt out to plaintiff in additional lots in Section 2 had both parties known the true circumstances of Parcel A. As to attorney fees for the defense of this suit we are unable to conclude that Krebs' negligence in placing only the north boundary of the levee right of way on the survey thereby misleading both parties caused defendants to incur legal expenses in the defense of the suit. Once defendants became aware of the shortage of Parcel A they were under some duty to cooperate with plaintiff in the rectification of the error. The cause of their expenses was their own obstinate refusal to deal with the problem on an amicable basis and their stubborn insistence on trying to deprive plaintiff of any equitable adjustment of the partition.
Accordingly, the judgment dismissing plaintiff's suit against defendant, Reynaud Construction Company, Inc., is reversed and set aside and there is judgment in favor of plaintiff, Sauve Heirs, Inc., and against defendant, Reynaud Construction Company, Inc., in the sum of $35,000.00 with legal interest from date of judicial demand until paid and for all costs of these proceedings; the judgment dismissing plaintiff's suit *249 against John D. Reynaud, Jr. is affirmed; and the third party demand against J.J. Krebs & Sons, Inc. is dismissed along with the demand of Krebs against Commonwealth Land Title Insurance Company and Commonwealth Title of New Orleans, Inc.
It is further ordered, adjudged, and decreed that plaintiff, Sauve Heirs, Inc., and defendant, Reynaud Construction Company, Inc., be recognized as owners in the indivision, subject to the rights of the Pontchartrain Levee District of the State of Louisiana, of the following described property, to wit:
A certain portion of land situated in the Parish of Jefferson, State of Louisiana, designated as Parcel A, on a plan of survey of J.J. Krebs & Sons, Inc., dated September 13, 1974. According to said plan, Parcel A lies wholly within the right of way of the Lake Pontchartrain Protection Levee and measures as follows: Beginning at a point at the southeast corner of the parcel it measures 181.55' along the north side of 45th Street to a point at the end of 45th Street; thence 6.33' along the north side of Lot 171, Square 13, Section 3, of Lake Trail Subdivision, to a point; thence 134.66' along the north side of said Lot 171 to a point at the northeast corner of an "area of conflict;" thence 60.06' along the north side of said "area of conflict" to its northwest corner; thence 569.86' north to the northwest corner of the parcel; thence 250.42' east along the north side of the parcel; and thence 740.72' south to the point of beginning.
All costs of these proceedings are to be divided between plaintiff and defendant, Reynaud Construction Company, Inc.
AFFIRMED IN PART REVERSED IN PART AND RENDERED.
PER CURIAM.
We clarify an inconsistency in our original opinion to decree that costs of these proceedings are to be divided equally between plaintiff and defendant, Reynaud Construction Company, Inc.
Both applications for rehearing are denied.