482 So.2d 685 (1985)
Carl David VINING
v.
Lillard Nelson BARDWELL, et al.
No. CA 84 0968.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
Rehearing Denied February 26, 1986.
Writ Denied May 1, 1986.
*686 Alton B. Lewis, Jr., Hammond, for plaintiff-appellee.
Robert Troyer, Ponchatoula, for defendant-appellee.
Charles A. Schutte, Jr., Baton Rouge, for defendant-appellant.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
LANIER, Judge.
This suit commenced as a "PETITION IN OPEN ACCOUNT" by a truck driver against a national trucking company and a husband and wife claiming the trucking company failed to properly pay him for truck driving services rendered and failed to refund a deposit, and the husband and wife wrongfully converted some of the money he earned from the trucking company.[1] The truck driver also claimed a 25% attorney fee. The trucking company filed an answer contending the plaintiff was an employee of the husband and wife and was not an employee of the trucking company. In the alternative, the trucking company filed a third party demand against the husband and wife contending the husband and wife agreed to contractually hold the trucking company harmless and, therefore, the husband and wife were liable to the trucking company for indemnification should it be cast in judgment. After the trial, but before judgment, the plaintiff filed a supplemental and amended petition contending in the alternative he was employed by the husband and wife and/or the trucking company and was entitled to the penalties and attorney fees provided for in La.R.S. 23:631-2. The trial court ruled there was a "contractual relationship" between the plaintiff and the trucking company and rendered judgment against the trucking company for $8,959.00. The trial court dismissed the claim for penalties, the claims against the husband and wife and the third party demand by the trucking company against the husband and wife. The trucking company took this suspensive appeal. The plaintiff answered the appeal seeking an increase in the amount awarded, penalties under La.R.S. 23:631-2 and judgment against the husband and wife (in addition to judgment against the trucking company).

FACTS
Prior to January of 1980, Carl David Vining and Lillard Nelson Bardwell had known each other for some time. In January of 1980, Bardwell and his wife, Joy, met Vining and his wife, Laurie, in the State of Washington. The Bardwells had been hauling loads as independent contractors for Bekins Van Lines Co., Inc. (Bekins) since January 21, 1979, under Bekins' account number 2683. The Bardwells urged Vining to get into the trucking business with Bekins, and he agreed to do so.
With Bardwell's help, Vining applied to take the Bekins' Owner Operator Orientation Program in Hillside, Illinois. By letter dated February 4, 1980, Bekins advised Vining that he had been accepted for the training program which would commence *687 on February 19, 1980. Vining was required to deposit $650 with Bekins. On February 8, 1980, Vining executed an agreement with Bekins which provided, in pertinent part, as follows:
I agree to enter the Bekins Van Lines Owner Operator Orientation Program as an Independent contractor. I fully understand and agree that during the term of my orientation and when I enter the Bekins' Owner Operator Fleet, I am not and will not be an employee of the Company; am not covered by the Worker's compensation, life insurance, disability, or any other insurance or benefits program of the Company....
I do agree to and understand the following conditions:
A. To travel to the Company's facilities at Hillside, Illinois for orientation at my own expense.
....
F. I presently own or am able to finance a vehicle meeting U.S. Department of Transportation and Bekins Van Lines Co. vehicle requirements.
G. I agree to deposit with the Company the necessary funds to be credited to my Commission Account prior to entering the orientation program. Said funds will be used as partial payment toward the cost of Illinois base plate, bobtail automobile liability insurance and worker's compensation policy for my employees (if required). The above deposit will be refunded, less deductions for training charges, should I voluntarily discontinue my training or fail to enter the Bekins Fleet upon completion of my training.

H. One hundred dollars of the above deposit (sub paragraph G) will be applied to my performance reserve account.
I understand that upon successful completion of the orientation program and compliance with the above conditions, I will be able to enter the Bekins Owner Operator Fleet and hereby agree to do so. I also understand that in the event I do not qualify or voluntarily drop out of the program, Bekins Van Lines Co. will not be responsible, financially or otherwise, for any expenses incurred by me while attending the orientation program.

[Emphasis added].
Vining successfully completed the two week orientation course. Thereafter, the Vinings and the Bardwells went on the road for about two or three weeks so that Vining could learn the trucking business. Although the record is not clear, apparently about this time, the Bardwell tractor (truck) was in an accident in California and had to be repaired. Bardwell apparently bought a new truck and commenced working it under Bekins' account number 2683. Apparently, the repaired truck was then set up under a new Bekins' account, number 3432, and the vehicle was designated as number 4300.
On March 14, 1980, at the Bekins office in Hillside, Illinois, Bardwell executed a contract with Bekins for the operation of truck number 4300 under Bekins' account number 3432. This contract provided, in pertinent part, as follows:
THIS AGREEMENT, made and entered into by and between BEKINS VAN LINES CO., a Nebraska corporation, whose principal place of business is 333 South Center Street, Hillside, Illinois 60162, hereinafter called "Company" or "Carrier"
and Lillard N. Bardwell # 3432
an independent owner-operator hereinafter referred to as "Contractor." Both parties mutually agree to the following:
1. Prior Agreements

This agreement supercedes and replaces any prior agreement or contract between the Company and the Contractor, and may not be sold, assigned or transferred without the prior written consent of the Company. Any and all changes to this agreement must be in writing and agreed to by both the Company and the Contractor.

*688 2. Relationship of Parties

A. The Carrier is an Interstate Commerce Commission authorized Common Carrier of household goods, and the Contractor is in the business of transporting goods by motor vehicle and desires to perform services for the Carrier.
B. The Contractor shall be an independent Contractor and shall not be deemed to be an employee of the Company for any purpose. The Contractor shall have absolute discretion with respect to the manner and method of performing hauling services pursuant to this Agreement, subject only to the Contractor's duty to perform these services in accordance with the Company's tariffs, bills of lading entered into by the Company and its shippers, good moving practices, and all applicable laws and regulations.

....
4. Vehicles

A. While performing services for the Company, Contractor agrees to utilize only the vehicle(s) described in the Equipment Lease attached hereto and marked Exhibit "A", a copy of which is attached to this contract and as may be amended from time to time. Contractor will notify Company in writing prior to any substitution of vehicle.
....
7. Contractor's Responsibilities

A. Contractor agrees to direct the operation and performance of all transportation services provided to Company pursuant to this Contract whether the labor utilized is the Contractor's own personal service or that of Contractor's employees. Contractor agrees to be responsible and shall personally determine the routes of travel, points of stop for rest and service of equipment, and shall in every respect direct and control Contractor's employees, including their hiring, discharge and training, and shall determine their wages, hours and working conditions.

....
13. Breach of ContractCause for Termination

The following acts shall be considered a material breach of the agreement on the part of Contractor and are cause for immediate termination.
....
C. Any failure of Contractor to manage and conduct business in Contractor's own name and for Contractor's own account in compliance with all applicable State, Federal and Local Laws governing Contractor's operations.
D. Any failure of Contractor to pay all wages and to make and pay all necessary income tax withholdings, and payments on behalf of Contractor's employees with respect to social security, worker's compensation insurance, unemployment insurance, and any other applicable payroll taxes or deduction imposed by law.
....
I. In the event Contractor's services in connection with any particular shipment or in connection with the operation of his equipment at any particular time shall fail to conform to the contract specifications, or be in violation of law, Company is hereby specifically empowered to request that Contractor take such actions or action as will again cause the services to meet the contract specification, or comply with the law, and should Contractor fail promptly to do so, Company may at its option either terminate this Contract altogether for cause or advise the Contractor to cease Operations pending a review of the Contract terms and specifications and Contractor's performance and qualifications. Except as provided in the preceding sentence, Contractor shall at all times remain free and fully responsible for the performance of all transportation services assigned to Contractor pursuant to this agreement, and fully responsible for all Contractor's business *689 operations and the actions of Contractor's agents and employees.

....
14. Miscellaneous

A. Neither Contractor or Company is the agent of the other, and neither shall have the right to bind the other, except that Contractor is authorized to act as Company's representative in the strict performance of Company's transportation services to its shippers in accordance with the terms and specifications of this contract governing the performance of each individual shipment assigned to Contractor.
[Emphasis added].
The contract also established a schedule by which payments would be made by Bekins to Bardwell. In two separate agreements attached to the primary contract, Bekins agreed to provide worker's compensation insurance and general liability insurance coverage for Bardwell. Each of these separate agreements contain the following provision:
2. Contractor's Warranties

(a) That Contractor is an independent contractor and not an employee of the Company, and that any and all persons hired or employed by Contractor to perform services in connection with the basic agreement existing between Company and Contractor, are the employees or agents of Contractor, and not those of Company.

[Emphasis added].
Also, on March 14, 1980, at the Bekins office in Hillside, Illinois, Bardwell and Vining entered into a lease-purchase agreement which provided as follows:
I, Carl David Vining, agree to lease one 1979 GMC Astro single axle tractor licensed as Bekins Van Lines Tractor # 4300 from Lillard Nelson Bardwell, Bekins Van Lines contractor # 2683 for a sum of ten percent (10%) of the gross linehaul of each shipment hauled beginning on or approximately March 21, 1980 with the understanding that I will purchase said vehicle on or before Sept. 15, 1980. During the time of this lease agreement, I agree to provide all maintenance on said tractor at my expense.
It is understood and agreed that the total price of the vehicle to be purchased will be $33,000.00. All monies paid to the seller with the exception of insurance and licensing fees will apply to the purchase price of said vehicle.
On that same date, Bardwell verbally agreed that Vining would be entitled to the revenues from the operation of vehicle number 4300 under Bekins' account number 3432. In two separate letters on Bekins' stationery, Bardwell gave authority to Bekins to allow Vining to draw funds from Bekins' account number 3432 for vehicle number 4300 and to send trip settlement checks for Bekins' account number 3432 for vehicle number 4300 to the First Guaranty Bank of Ponchatoula, Louisiana, in the name of Vining. Thereafter, Vining commenced making hauls for Bekins. Vining was dispatched directly by Bekins. Vining submitted his trip settlement statements directly to Bekins.
On March 21, 1980, Bekins issued a certificate to Vining, as owner of vehicle number 4300, indicating that Bekins was operating that vehicle under a lease which expired on April 25, 1980.
During the latter part of May of 1980, the Bardwells advised the Vinings that payments were not properly being made under the "lease-purchase" agreement. The Bardwells contended the total gross linehaul earnings were $21,823.30, that $2,182.32 should have been paid to them and that only $1,407.57 had been actually paid. The Bardwells testified that Vining verbally agreed to pay $1,500 per month commencing in June of 1980. The Vinings denied this agreement. A dispute also developed between the parties about charges against account number 2683 being erroneously made on account number 3432.
Vining continued to operate vehicle number 4300 under Bekins' account number 3432 until on or about June 23, 1980. At that time, Vining felt he was not being paid properly for the work he was doing and *690 quit. He turned vehicle number 4300 into the Bekins warehouse in New Orleans, Louisiana. Vining did not notify Bardwell of his actions.
On a subsequent date (the record does not clearly show when), the Bardwells stopped at the Bekins office in Hillside, Illinois, and were advised that Vining quit and left their truck in New Orleans. Previously, Bekins had issued a check for $3,361.07 in the name of Vining and Bardwell for Vining's work during the second half of May of 1980. Vining tried to cash this check, but it was not accepted by his bank. Vining returned the check to Bekins to be reissued only in his name. Bekins was in the process of reissuing this check when the Bardwells stopped at its office, and the Bardwells had Bekins reissue the check in their names. At this same time, Bardwell advised Bekins he revoked authority for Vining to draw on Bekins' account number 3432 for vehicle number 4300 and he revoked his authority for Bekins to send settlement checks in Vining's name from Bekins's account number 3432 for vehicle number 4300 to the First Guaranty Bank of Ponchatoula, Louisiana.
The Bardwells recovered their truck and Mrs. Bardwell operated it for three weeks. Thereafter, the Bardwells secured another driver for the truck. At the time of trial on February 7, 1983, truck number 4300 was being operated under Bekins' account number 3432 by Bardwell's son. Bekins' account number 2683 was terminated by the Bardwells on August 3, 1981.
On July 8, 1980, counsel for Vining made formal written demand upon Bekins for payment of $11,086.04 for hauling done during the period of May 15, 1980, through June 23, 1980. Demand was also made for $550 as a refund for the Illinois base trucking license plate. The total amount of this claim was $11,636.04.
On or about July 25, 1980, the Bardwells sent a check to Vining for $760, which sum they calculated was the balance due to him. The Bardwells also sent Vining an Internal Revenue Form 1099-NEC showing nonemployee compensation in 1980 of $21,685.54.
This suit was filed on May 20, 1981.

EMPLOYMENT CONTRACT BETWEEN BEKINS AND VINING
Bekins contends the trial court committed error by finding there was an employment contract between Bekins and Vining.[2]
An employee (servant) is a person who lets, hires or engages his services to another to be employed at any work, commerce or occupation whatever for the benefit of the other for a certain price, or upon certain conditions. La.C.C. art. 163. The general rules which control contracts of employment are found in Title IX of the Civil Code dealing with leases. La.C.C. arts. 164 and 2668 et seq. In particular, Chapter 3 of Title IX has more specific rules for leases of labor and industry. La. C.C. art. 2745 et seq. A lease of labor (contract of employment) is a synallagmatic contract, to which consent alone is sufficient, and by which one party gives to the other the enjoyment of his labor (one party binds himself to do something for the other) at a fixed price. La.C.C. arts. 2669 and 2675. Three things are absolutely necessary for a lease of labor: (1) the thing (labor); (2) the price; and (3) the consent. La.C.C. art. 2670. An employment contract may be express or implied. Vaughn v. Baton Rouge General Hospital, 421 So.2d 288 (La.App. 1st Cir.1982). The four primary evidentiary factors considered in deciding the existence of an employment contract are: (1) selection and engagement; (2) payment of wages; (3) power of dismissal; *691 and (4) power of control. Sellers v. City of Abbeville, 458 So.2d 592 (La.App. 3rd Cir. 1984), writ denied, 462 So.2d 1248 (La. 1985); Prince v. Baton Rouge General Hospital, 449 So.2d 90 (La.App. 1st Cir. 1984), writ denied, 450 So.2d 966 (La.1984).
To properly understand any legal relationship between Vining and Bekins, we must examine the Bekins-Bardwell and Bardwell-Vining legal relationships. On March 14, 1980, when the Bekins-Bardwell and Bardwell-Vining agreements were entered into, Bardwell was the owner of truck (tractor) number 4300. To be in the Bekins fleet of independent contractors, a person had to own a truck. Vining did not own a truck at that time. In plaintiff's Exhibit 6 (the Bekins-Bardwell contract), Bardwell agreed to be an independent contractor to haul Bekins' trailers with truck number 4300 for a specific schedule of payments. This is a lease of services by a carrier for the conveyance of goods. La. C.C. art. 2745. In paragraph 7(A) of the contract, Bekins and Bardwell agreed that these hauling services could be performed by Bardwell personally or by Bardwell's employees. Apparently, in a separate agreement, Bardwell leased truck number 4300 to Bekins.[3] At the time of trial on February 7, 1983, Bekins and Bardwell were apparently still operating under these leases.
Bardwell and Vining orally agreed Vining would operate truck number 4300 for a consideration of the truck's revenues paid by Bekins. This is a lease of labor (employment contract). La.C.C. art. 2745(1). To accomplish payment of the consideration for the convenience of the parties (both of whom were constantly on the road), Bardwell gave written authority to Bekins to allow Vining to draw on all money due on Bardwell's account number 3432 for truck number 4300 and to send all trip settlement checks for Bardwell's account number 3432 for truck number 4300 to the First Guaranty Bank of Ponchatoula, Louisiana, in the name of Vining.
In the document entitled "lease-purchase agreement", Bardwell purportedly leased truck number 4300 to Vining for the period of March 14, 1980, to September 15, 1980, for a consideration of 10% of the truck's gross linehaul earnings, and Vining agreed to buy truck number 4300 from Bardwell on or before September 15, 1980, for a consideration of $33,000. The 10% gross linehaul earnings paid would be applied to the purchase price, less insurance and licensing fees. Obviously, truck number 4300 could not be leased by Bardwell to Vining and Bekins at the same time. Equally obvious is that Vining could not agree to pay Bardwell 10% of the gross linehaul earnings of truck number 4300 if he did not have prior authority from Bardwell to operate and receive the revenues from that vehicle. It is abundantly clear from the evidence Bardwell and Vining contemplated operating truck number 4300 under Bardwell's lease agreements with Bekins. Therefore, we must conclude that the "lease-purchase agreement" was not intended by the parties to affect or impugn the lease rights of Bekins. When viewed in this light, the true nature of the agreement emerges.
Although the "lease-purchase agreement" indicates that Vining agrees to buy the truck by a certain date for a fixed price, by implication the agreement contains a promise by Bardwell to sell the vehicle under those circumstances. La. C.C. art. 2462. The promise of Vining to pay 10% of gross linehaul earnings, less insurance and licensing, constitutes the giving of earnest money pursuant to La.C.C. art. 2463.
Mr. and Mrs. Bardwell testified Vining was their employee. Mr. and Mrs. Vining testified they thought Vining was employed by Bekins. However, Vining testified *692 as follows on cross-examination by counsel for Bekins:
Q. I want you to read paragraph "G" of this agreement one.
A. "I agree to deposit with the company the necessary funds to be credited to my commission account prior to entering the orientation program. Said funds will be used as partial payment toward the cost of Illinois base plate, bob-tail automobile liability insurance and workmen's compensation policy for my employees if required. The above deposit will be refunded less deductions for training charges should I voluntarily discontinue my training or fail to enter the Bekins fleet upon completion of my training."
Q. Did you enter the Bekins fleet?
A. I thought I did.
Q. You didn't own a tractor though did you? A trailer?
A. Well I was buying one.
Q. Did you have a contract with Bekins by which you entered the Bekins fleet?
A. No.
Q. You did not have such a contract?
A. No.
Q. So you did not enter the fleet as the condition states on this document did you?
A. No not on that condition there.
Q. And doesn't this say that the money is not to be refunded if you don't enter into the...
A. Well some of it...
Q.... the fleet?
A.... some of it should.
Q. But you agreed...
A. They didn't send me nothing saying what they done with it so I mean...
Q. But the fact is that they were authorized to withhold that money...
A. Well...
Q.... to pay for training expenses weren't they?
A. Yes.
....
Q. Mr. Vining is it fair to say that you were acting as a sub-contractor under Mr. Bardwell, is that the way they referred to it in the trade or in the business?
A. I guess I didn't know they had sub-contractors. That never was mentioned to me.
Q. Well but the fact is you never had a contract directly with Bekins?
A. I don't guess.
Q. And your only contract or the only thing that you've testified to this morning is a lease purchase agreement with the Bardwells is that correct?
A. Yeah
Q. And any work that you did was done under their account and any ... was any of the business assigned to you that, that didn't go through that account or did not come through the Bardwells?
A. No.

Selection and Engagement
The Bekins-Bardwell contract specifically shows those parties intended that Bekins would hire Bardwell to operate truck number 4300 in the Bekins fleet, that Bardwell could perform the hauling services personally or with employees and that anyone retained by Bardwell to perform services in connection with the agreement would be an employee of Bardwell. The evidence shows Bardwell encouraged Vining to go through the Bekins training program and thereafter employed him to operate truck number 4300. Although Bekins was aware of the Bardwell-Vining agreements, there is no evidence to show Bekins engaged or selected Vining to operate truck number 4300. Indeed, under the Bekins-Bardwell contract, Bekins had no authority or responsibility to do so.

Payment of Wages
The Bekins-Bardwell contract specifically provided that payments would be made by *693 Bekins to Bardwell pursuant to a schedule. The contract does not provide for payments by Bekins to anyone else. Bardwell gave authority to Bekins to make payments directly to Vining for convenience. By consenting to this arrangement, Bekins did not consent to have Vining as its employee. When Bardwell revoked this authority, Bekins ceased making payments to Vining and resumed making them to Bardwell.

Power of Dismissal
Under paragraph 7(A) of the Bekins-Bardwell contract, Bardwell "shall in every respect direct and control ... employees, including their hiring, discharge and training, and shall determine their wages, hours and working conditions." There is no evidence in the record that Bekins had authority to dismiss Vining from performing under the Bekins-Bardwell contract.

Power of Control
Under paragraph 2(B) of the Bekins-Bardwell contract, Bardwell agreed to perform hauling services for Bekins "in accordance with the Company's tariffs, bills of lading entered into by the Company and its shippers, good moving practices, and all applicable laws and regulations." Implicit in this obligation is that Bekins would tell Bardwell where to pick up the load and where to deliver it. However, Bardwell retained "absolute discretion with respect to the manner and method of performing hauling services pursuant to this agreement". When Bardwell made his agreements with Vining, Vining was bound to comply with these obligations. The evidence shows that Bekins directly dispatched Vining on trips and did not go through Bardwell. Although this is a significant factor, it must be balanced with the other factors.
The case of Singleton v. Gulf Coast Truck Service, Inc., 409 So.2d 377 (La.App. 4th Cir.1982), relied on by Vining, is factually distinguishable from the instant case. In Singleton, an interstate carrier leased a truck from Harris. Singleton contacted Harris about driving the truck. Harris took Singleton to the carrier's office to discuss employment. The carrier's manager advised Singleton what his pay would be and the carrier's employees gave Singleton an employment application, a medical card and a certificate that he passed an I.C.C. examination. Singleton received advances for expenses from the carrier (apparently without Harris' authorization) and made purchases of fuel in the carrier's name.
After considering the pertinent evidentiary factors, we must conclude there was no employment relationship between Vining and Bekins.[4]Cf. Roberts v. State, Through Louisiana Health and Human Resources Administration, 404 So.2d 1221 (La.1981). Although Bekins agreed to comply with Bardwell's request that it pay Vining directly and dispatched Vining directly, the great weight of the evidence shows Bekins did not consent for Vining to be its employee. The factual ruling of the trial court to the contrary is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Prior to trial, counsel for Vining attempted to serve R.T. Ryden, Bekins' manager, who was a resident of Chicago, Illinois, through Bekins' Louisiana attorney. When Ryden was called to testify at the trial by counsel for Vining, counsel for Bekins advised the court that Ryden was not present, he was counsel for Bekins and not counsel for Ryden individually and stipulated that Mrs. Bardwell would testify as a representative of Bekins. Counsel for Bekins asserted that service on him could not be service on Ryden because Ryden was not a party to the suit and he (counsel) did not represent Ryden. Counsel for Vining contends in brief that the failure to produce Ryden "creates a presumption that the testimony of Mr. Ryden, business manager of Bekins, would have been adverse to the interest of defendants."
*694 La.C.C.P. art. 1355 provides that "[w]hen a party is summoned as a witness, service of the subpoena may be made by personal service on the witness' attorney of record." Ryden is not a party to this suit and has no counsel of record. Because Ryden is not a party and does not reside or work in this State, he cannot be subpoenaed. La.C.C.P. art. 1352. The record reflects no attempt by counsel for Vining to secure Ryden's testimony by deposition. La.C.C.P. art. 1435; La.R.S. 13:3823. Mrs. Bardwell was designated to represent Bekins at the trial and did so. In this factual posture, there is no adverse presumption. Sauve Heirs, Inc. v. Reynaud Construction Co., Inc., 441 So.2d 239 (La.App. 4th Cir.1983); Fortenberry v. Fortenberry, 432 So.2d 1125 (La.App. 3rd Cir.1983); Liner v. Patrick, 421 So.2d 391 (La.App. 1st Cir.1982).
This assignment of error has merit.

VINING'S RIGHT TO REFUND OF DEPOSIT WITH BEKINS
The trial court award was composed of $8,409.00 for services rendered and $550 as a refund on the deposit for the orientation course. Vining did not "enter the Bekins Fleet" upon completion of his training and, pursuant to his agreement with Bekins, he is entitled to the refund, less deductions for training charges. Since Bekins has presented no evidence of what were those training charges, Vining can recover the entire amount.[5]

VINING'S CLAIM AGAINST THE BARDWELLS
Vining answered the Bekins appeal asserting, among other things, that he was aggrieved by the failure of the trial court to grant judgment in his favor against Bekins and the Bardwells in solido. The substantive and procedural effect of an answer to an appeal is the same as an appeal. State ex rel. Guste v. Pickering, 365 So.2d 943 (La.App. 4th Cir.1978), writ denied, 366 So.2d 556 (La.1978). The only distinction between them is that La.C.C.P. art. 2133 requires that an answer to an appeal state the relief demanded. The party answering an appeal is an appellant for purposes of the appellate relief he seeks. The Courts of Appeal of Louisiana will only review an issue which is contained in an assignment or specification of error. Rule 1-3, Uniform RulesCourt of Appeal. Further, a court of appeal may consider as abandoned an assignment or specification of error which has not been briefed. Rule 2-12.4, Uniform RulesCourt of Appeal. Vining has not assigned as error in his brief the failure of the trial court to grant judgment in his favor against the Bardwells, nor has he briefed this issue. In this factual posture, this complaint asserted in the answer to the appeal has been abandoned. Vernon v. Aetna Life and Casualty Insurance Company, 442 So.2d 674 (La. App. 1st Cir.1983); Ketcher v. Illinois Central Gulf Railroad Company, 440 So.2d 805 (La.App. 1st Cir.1983), writs denied, 444 So.2d 1220, 1222 (La.1984).

DECREE
For the foregoing reasons, the judgment in favor of Vining against Bekins is amended to reduce it to $550 with legal interest thereon from date of judicial demand. All costs, including the cost of this appeal, are to be divided equally between Vining and Bekins.
AMENDED AND AFFIRMED.
NOTES
[1] The claim for payment for services rendered is a suit in contract. The claim for wrongful conversion of funds is a suit in tort. The defendants did not timely file a dilatory exception pleading the objection of improper cumulation of actions. La.C.C.P. art. 926(7).
[2] The Bekins-Bardwell contract specifically provides it is to be interpreted under Illinois law. The Bardwell-Vining agreements were made in Illinois. The parties hereto have not asserted that Illinois law is applicable or attempted to show that Illinois law is different from Louisiana law. Accordingly, we will apply Louisiana law to determine the legal relations between the parties. La.C.C.P. art. 1391; Johnson v. Nationwide Life Insurance Company, 388 So.2d 464 (La.App. 2nd Cir.1980); Davis v. Stern, 348 So.2d 726 (La.App. 1st Cir.1977).
[3] Paragraph 4(A) of the Bekins-Bardwell agreement refers to the "vehicle(s) described in the Equipment Lease attached hereto and market Exhibit `A', a copy of which is attached to this contract...". The contract, plaintiff's Exhibit 6, does not have an Exhibit "A" attached to it. However, the evidence is uncontradicted that truck number 4300 is the vehicle referred to in the contract.
[4] Because we find no employment contract, it is unnecessary to determine what type of employment contract this might be. See, for example, Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968).
[5] Vining's claim that he was employed by Bekins appears to be inconsistent with his claim for the refund. Vining can only claim the refund if he failed to join the Bekins Fleet upon completion of his training. If he entered the Bekins Fleet (was employed by Bekins), he cannot get the refund.