520 So.2d 728 (1988)
BANK OF GREENSBURG
v.
Jerry FORREST and Susan Forrest.
No. 87-C-1761.
Supreme Court of Louisiana.
February 29, 1988.
*730 Keith D. Jones, Jones & Counce, Baton Rouge, for applicant.
Richard D. McShan, Sibley & McShan, Greensburg, for respondent.
WATSON, Justice.
After the Bank of Greensburg sued Jerry and Susan Forrest on a promissory note for $24,606.04, defendants asserted an affirmative defense, lack of consideration. The trial court gave judgment to the bank, and the court of appeal affirmed.[1] A writ was granted to review the judgment.[2]

FACTS
Bruce Shapiro, who worked for D & Carter Leasing, Inc. as a lot manager in Giddings, Texas, borrowed money from the Bank of Greensburg in Greensburg, Louisiana, to purchase two hundred shares of D & Carter stock. Clay Doughty, Vice-President of D & Carter, signed the note as guarantor and the stock was pledged as additional security. Shapiro's replacement, Jerry Forrest, was urged by co-workers to purchase Shapiro's stock. Jerry and his wife, Susan, were interested in purchasing the stock, and Doughty assured them they would be given priority if Shapiro decided to sell.
In August of 1982, Doughty told the Forrests that the stock was available. The Forrests accompanied Doughty to the Bank of Greensburg where they met with the bank's president, Henry Meyers. Meyers agreed to help the Forrests obtain ownership of the stock and also agreed to loan the necessary funds. Doughty agreed to sign as guarantor for the Forrests. In the presence of Doughty and Meyers, the Forrests signed a blank promissory note, but Doughty did not sign as guarantor. No money changed hands in this paper transaction.
After leaving the bank, the Forrests discovered the D & Carter stock was worthless. They testified that they returned to the bank the same day and told Meyers they were no longer interested in buying the stock. The Forrests did not obtain the promissory note they had signed and assumed it would be thrown away. Sometime later, Susan Forrest also telephoned Meyers to reiterate their desire to cancel the transaction. The Forrests also contacted Shapiro to tell him not to transfer the stock. Meyers did not remember the Forrests returning to the bank the day the note was signed, but he did admit that Susan Forrest called him a few days later.
Despite the Forrests' instructions, Meyers contacted Shapiro about transferring title to the stock. The bank hired an attorney in Oklahoma, where Shapiro had been discovered after some effort, and sent him Shapiro's stock certificate. The bank paid the attorney a $50 fee to have Shapiro appear before a notary and sign over the stock certificate. The attorney then sent the certificate back to the bank. Meyers understood that the Forrests were the assignees of the stock at the time Shapiro signed the transfer, but he was not certain. *731 The certificate was not introduced into evidence.
When Meyers received the signed stock certificate, he hand carried it to the D & Carter offices so that a new stock certificate could be issued in the Forrests' name. A stock certificate was issued in the name of "Jerry Forrester" dated November 10, 1982. The bank did not inquire as to the stock's value but kept the newly issued stock certificate. The bank then filled in the Forrests' note, dating it November 11, 1982, in the amount of $30,670.80, payable in sixty monthly installments of $511.18 beginning December 15, 1982. The note also provides for eighteen percent interest from maturity and attorney's fees of twenty-five percent. The bank filled in the back of the note to show that two hundred shares of D & Carter stock were pledged to secure the note and that the face amount of the note was comprised of $20,091.11 in principal and $10,579.69 in interest. Shapiro's note, with Doughty as guarantor, was marked "paid".
The Forrests were not informed of the transfer or sent a copy of the stock certificate. When Meyers called Jerry Forrest in December of 1982, he was told the Forrests did not want the stock. No payments were ever made on the promissory note. On March 8, 1984, the bank filed suit on the note.
The bank maintains that there was a valid sale of stock between Shapiro and the Forrests and a loan by the bank to the Forrests evidenced by the signed promissory note.

LAW AND CONCLUSION
A valid contract of sale must have the consent of the parties and their agreement as to the thing sold and its price.[3] Although Shapiro's stock was the thing allegedly sold, it is questionable whether there was an agreement on its price.[4] See LSA-C.C. art. 2464.[5] Even more important, there was no consent between the parties. Shapiro and the Forrests had not had any contact or agreement at or prior to the bank meeting. Compare LSA-C.C. art. 2456.[6] The buyers withdrew their consent before the bank undertook obtaining Shapiro's consent and acquisition of the thing to be sold.
The act of mandate occurs when a person, a principal, gives another person, an agent, the power to transact one or several affairs in his name.[7] An agent's *732 authority may be actual, express or implied, or apparent.[8] Doughty did not have actual authority to consent to the sale as Shapiro's agent. There was no evidence of written authorization or of a verbal communication that would have served as an express indication of agency. Neither was there any implied authority. Implied authority can be inferred from the nature and circumstances of the agency and empowers the person acting as agent to do anything necessary to accomplish the purpose of the mandate.[9] Doughty's positions as vice-president of the company, Shapiro's former employer, guarantor on Shapiro's note, and Jerry Forrest's employer were irrelevant to his authority to act as Shapiro's agent. Although he was guarantor on Shapiro's note, which was secured by the stock, he was not the owner of the stock. Since he succeeded in having the Shapiro note marked "paid" and did not sign the Forrests' note, it appears that he was acting for his own benefit.
The other component of agency, apparent authority, is a judicially created concept of estoppel which binds the principal for the unauthorized act of an apparent agent in favor of a third person.[10] To trigger the concept, however, the principal must first give the third party reason to believe that the agent had authority to act, on which the third party reasonably relied. The party seeking to prove that an agency relationship exists has the burden of proof.[11] Here the bank has not met its burden of proving apparent authority. Shapiro had not contacted the bank either prior to or at the time of the August meeting. Meyers testified the bank conducted the transaction solely on Doughty's recommendation.[12] Doughty, who lacked both actual or apparent authority, was not Shapiro's agent in the alleged sale of stock. If Doughty had been Shapiro's agent, the stock sale could have been completed in August, since the bank held Shapiro's stock certificate. The amount Shapiro owed on that date was certain and there would have been no need to have the Forrests sign a blank promissory note.
The bank was not acting as Shapiro's agent. If Shapiro had signed an instrument which authorized the bank to assign, sell or alienate his stock while it was held in pledge for his bank loan, the bank did not offer it in evidence. The bank obviously lacked authority to transfer the stock because it went to considerable effort to locate Shapiro and effect the transfer. If the bank had had the authority to transfer the stock, it could have done so internally.
Since there is no evidence that Shapiro consented to the sale, either personally or through an agent, before the Forrests withdrew their consent, the sale was invalid for lack of consent between the parties.
Meyers purported to act on behalf of the Forrests. One who acts for or in the place of another person by authority from him is a mandatary, or agent.[13] A mandate may be written or oral[14] and is accepted either expressly or tacitly.[15] A verbal mandate can be proved by testimonial proof under the rules applicable to conventional obligations,[16] i.e., one witness and *733 corroborating circumstances.[17] Here, there was no testimony in conflict with the finding of a mandate. Meyers testified he agreed to help the Forrests obtain the stock[18] and that he acted as their agent in arranging for the stock transfer.[19] There was an express, verbal agreement between Meyers and the Forrests.
A mandate can be revoked by the principal whenever he thinks it proper.[20] The Forrests revoked the mandate when they informed Meyers either the day of or a few days after the note signing (but at all events long before the stock transfer) that they no longer wanted Meyers' help in obtaining the stock transfer and completion of the loan agreement. Meyers ignored this revocation and continued to carry out the original mandate. First, the bank went to considerable effort to find Shapiro; next, the bank hired an out-of-town attorney and paid a fee to arrange that the formalities were observed in the stock transfer. Then, Meyers himself hand carried the signed stock certificate to the D & Carter offices for issuance of a new stock certificate. Meyers then pledged the new stock certificate and completed the blank promissory note. The Forrests are not bound by their mandatary's actions after they revoked the mandate.
"As between principal and agent the limit of the agent's authority to bind the principal is governed by the agent's actual authority."[21]
An incomplete instrument, such as a promissory note, becomes effective and enforceable when completed by an authorized party. A party claiming that completion is unauthorized must bear the burden of proof. The rules as to material alteration of negotiable instruments then apply.[22] Completing a note except as authorized is a material alteration which renders it unenforceable.[23] Meyers' actual authority to obtain the stock transfer and to complete the loan transaction ended when the Forrests made known their intention to stop the deal. Meyers lacked the authority to complete any part of the blank promissory note, yet he filled in the date, the sum payable, the interest due, time of installments, and security pledged. Meyers not only materially altered the note, he created it. Because he did so after the Forrests' revocation, the note is unenforceable.
Ownership of the stock did not pass because there was no valid sale between Shapiro and the Forrests. The Forrests could *734 not pledge stock they did not own, and the promissory note filled in by Meyers is unenforceable against the Forrests because it was completed without authority or consideration.

DECREE
For the foregoing reasons, the judgments of the trial court and the court of appeal are reversed, and plaintiff's suit is dismissed, plaintiff to pay all costs.
REVERSED.
NOTES
[1] 510 So.2d 46 (La.App. 1 Cir.1987).
[2] 514 So.2d 116 (La.1987).
[3] LSA-C.C. art. 2439 provides:

"The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
"Three circumstances concur to the perfection of the contract, to wit: the thing sold, the price and the consent."
[4] The parties' testimony revealed the price agreed on was to be the amount owed on Shapiro's note as of the date the Forrests signed the promissory note, sometime in August of 1982. The amount was not filled in until after Meyers had received the signed stock certificate from Shapiro and had effectuated the issuance of a new stock certificate for the Forrests. The date on the note was then filled in as November 11, 1982. Meyers testified that the amount entered on the note was the amount due when the stock was transferred in November, 1982. (Tr. 11) The Forrests have not contested the amount of the note; however, it is unnecessary to determine whether the amount of the note reflects the agreement of the parties since the sale is invalidated for lack of consent.
[5] LSA-C.C. art. 2464 provides:

"The price of the sale must be certain, that is to say, fixed and determined by the parties.
"It ought to consist of a sum of money, otherwise it would be considered as an exchange.
"It ought to be serious, that is to say, there should have been a serious and true agreement that it should be paid.
"It ought not to be out of all proportion with the value of the thing; for instance the sale of a plantation for a dollar could not be considered as a fair sale; it would be considered as a donation disguised."
[6] LSA-C.C. art. 2456 states:

"The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid."
[7] LSA-C.C. art. 2985 provides:

"A mandate, procuration or letter of attorney is an act by which one person gives power to another to transact for him and in his name, one or several affairs."
[8] Boulos v. Morrison, 503 So.2d 1, 3 (La.1987), rehearing denied.
[9] Broadway v. All-Star Insurance Corporation, 285 So.2d 536 at 538 (La.1973), reh. denied.
[10] Id., at 538; Boulos, supra, at 3.
[11] Boulos, supra, at 3.
[12] Tr. 10.
[13] See Footnote 7, infra.
[14] LSA-C.C. art. 2992 states:

"A power of attorney may be given, either by a public act or by a writing under private signature, even by letter.
"It may also be given verbally, but of this testimonial proof is admitted only conformably to the title: Of Conventional Obligations."
[15] LSA-C.C. art. 2989 provides:

"A power of attorney may be accepted expressly in the act itself, or by a posterior act.
"It may also be accepted tacitly; and this tacit acceptance is inferred, either from the mandatary acting under it, or from his keeping silence when the act containing his appointment is transmitted to him."
[16] See Footnote 14, infra.
[17] LSA-C.C. art. 1846, formerly LSA-C.C. art. 2277, provides:

"When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.
"If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstancs."
See Savoie v. Estate of Rogers, 410 So.2d 683 (La.1981), on rehearing, 410 So.2d 687 (La. 1982), appeal after remand, 442 So.2d 1323, writ den. 445 So.2d 1227.
[18] Tr. 10.
[19] Tr. 54.
[20] LSA-C.C. art. 3028 provides:

"Except in the case of irrevocable powers of attorney, as described in the preceding article, the principal may revoke his power of attorney, whenever he thinks proper, and, if necessary, compel the agent to deliver up the written instrument containing it, if it be an act under private signature."
[21] Boulos, supra, at 3; Broadway, supra.
[22] LSA-R.S. 10:3-115 provides:

"(1) When a paper whose contents at the time of signing show that it is intended to become an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.
"(2) If the completion is unauthorized the rules as to material alteration apply, even though the paper was not delivered by the maker or drawer; but the burden of establishing that any completion is unauthorized is on the party so asserting."
[23] LSA-R.S. 10:3-407 provides in pertinent part:

"(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in
* * * * * *
"(b) an incomplete instrument, by completing it otherwise than as authorized; * * *"