532 So.2d 453 (1988)
ODECO OIL & GAS COMPANY
v.
Marcel J. NUNEZ, Sr.
No. CA 87 0855.
Court of Appeal of Louisiana, First Circuit.
October 12, 1988.
Writ Denied January 6, 1989.
*454 Walter Christy and Bart Sisk, New Orleans, for plaintiff, appellant.
Patrick J. Berrigan, Slidell and Gilbert Ganucheau, Jr., New Orleans, for defendant, appellee.
Before CARTER, LANIER and LeBLANC, JJ.
*455 LANIER, Judge.
This is a suit for damages by an employer against an employee asserting causes of action in tort and contract for breach of the duty of fidelity owed by the employee to the employer. The employer also obtained a writ of attachment for some of the employee's property. The trial court found as fact that the employee "violated the trust that the company placed in him" and that the employee "clearly knew that what he was doing was in violation of his company's policies", but held that the employer failed "to prove the existence of fraud or actual damages by clear and convincing evidence" and dismissed the employer's suit. The employer took this suspensive appeal.

FACTS
In 1962, Marcel J. Nunez, Sr. was employed by Ocean Drilling & Exploration Company as an electrical mechanic in the production department. On January 8, 1965, Nunez was promoted to maintenance supervisor in the same department. On June 15, 1967, while working as maintenance supervisor, Nunez filled out a questionnaire concerning his employer's conflict of interest policy. This policy prohibited, among other things, any officer or employee from engaging in any type of activity that would amount to a conflict of interest, including the following:
a.) Ownership by an employee or any member of his immediate family living with him of a substantial financial interest in any outside concern which does business with, or is a competitor of, the Company, except where such interest consists of securities of a publicly owned corporation and such securities are regularly traded on the open market.
b.) Rendition by an employee of directive, managerial or consultative service to any outside concern which does business with, or is a competitor of, the Company, except with the Company's knowledge and consent.
In the questionnaire, Nunez acknowledged that he had read the conflicts of interest policy and that he had no interest which would amount to a conflict as defined in the policy. Nunez also obligated himself to "make prompt and full disclosure to the company of any situation which may involve a conflict of interests."
On March 10, 1972, Nunez was promoted to maintenance foreman. Nunez's duties as maintenance foreman were, among other things, supplying technical supervision to all personnel performing mechanical and/or electrical work, coordinating all work on mechanical and electrical equipment, controlling repair costs on mechanical and electrical equipment, and originating, approving and/or recommending approval of requisitions and service and repair orders as needed. Nunez directly supervised the company's field foremen working on production platforms and was primarily responsible for requesting and authorizing repairs to navigational aids and the leasing of replacement generators.
In 1974, Ocean Drilling and Exploration Company formed Odeco Oil & Gas Company (ODECO) as a wholly owned subsidiary. Nunez began working for ODECO shortly after ODECO was formed and continued to work for ODECO until his termination in August of 1985. Nunez transferred to ODECO as a maintenance foreman with the same duties and responsibilities, at the same pay, and with the same benefits as he had with Ocean Drilling & Exploration Company.
In 1976, Nunez formed a company known as Dixie Generator Rentals, Inc. (Dixie). Bobby Miller, a sales representative for Tideland Signal Company, a company which did business with ODECO, was shown as the incorporator and president of Dixie. However, Nunez operated the business on a day-to-day basis and also received the profits made by the company. After Dixie was formed, Nunez used his position as maintenance foreman at ODECO to insure that, whenever ODECO had need of a rental generator, the order was placed with Dixie if Dixie had the correct size that ODECO needed. Dixie supplied rental generators to ODECO during the period of 1976 through August of 1985. ODECO's internal audit manager testified Dixie's *456 charges for rentals during this period of time were $79,951 higher than standard market prices. During this period, Nunez's supervisor had no knowledge of Nunez's ownership interest in Dixie.
In 1978, Nunez was approached by Alvin Benjamin, a navigational aid repairman. Benjamin asked Nunez if he (Benjamin) could do navigational aid repair work for ODECO through his (Benjamin's) company, Benco. Nunez told Benjamin that he (Nunez) would form a navigational aid repair company and that Benco could do the ODECO repair work for Nunez. Nunez then formed Dynamic Electronics, Inc. (Dynamic). Clara Braquet was named as President of Dynamic. At the time of incorporation, Braquet received Dynamic stock which she, in turn, assigned to Nunez. Although Braquet signed all the incorporation papers for Dynamic, Nunez made all the arrangements concerning the formation of the company.
During the period of 1978-1985, Nunez used his position as maintenance foreman at ODECO to have all the navigational aid repair work performed by Dynamic, unless the work had to be done by the manufacturers of the equipment. ODECO navigational equipment that was in need of repair would be brought in from the field by foremen working under Nunez's direct supervision and picked up by Nunez. Nunez personally delivered the navigational aids to Braquet who turned them over to Benco. Benco repaired the navigational aids and returned them to Braquet. Nunez then picked up the repaired items and returned them to ODECO. Benco invoiced Dynamic for the repair work, and Braquet, using prices set by Nunez, issued a Dynamic invoice to ODECO. During this period, Dynamic paid Benco $106,290 for work performed, and Dynamic billed ODECO $502,785 for this same work, a difference of $396,495. Nunez himself picked up the Dynamic invoices and submitted them for payment to ODECO. As with Dixie, Nunez never told anyone at ODECO of his involvement with Dynamic.
In August of 1985, ODECO was notified by the Federal Bureau of Investigation about Nunez's involvement in Dixie and Dynamic. After ODECO conducted its own internal investigation, Nunez was terminated.

BURDEN OF PROOF
(Assignment of Error Number 3)
The trial court decided this case with the following rationale:
The court finds that under the policies of the company, Nunez clearly violated the trust that the company placed in him. He also clearly knew that what he was doing was in violation of his company's policies. Odeco submitted voluminous accounting sheets and made analyses which attempted to suggest that there may have been some damages as a result of Nunez's violation of company policy. But these records are insufficient to prove the existence of fraud or actual damages by clear and convincing evidence. Hoover v. Mid-South Exploration Company Inc., 479 So.2d 551, (La. App.1985).
ODECO contends the trial judge "erred in applying the wrong standard of proof as to the existence of fraud and damages." ODECO asserts the trial judge required it to meet a "clear and convincing" burden of proof when, under the law, the case should have been examined under a "preponderance of evidence" standard.
The common standard of proof in civil cases is a preponderance of the evidence. However, there are a limited number of claims and contentions which can be proven only by an intermediate standard termed "clear and convincing" evidence. Succession of Lyons, 452 So.2d 1161 (La. 1984). In Succession of Riggio, 468 So.2d 1279, 1288 (La.App. 1st Cir.), writ denied, 472 So.2d 33 (La.1985), this court observed as follows:
What constitutes clear and convincing evidence is further explained in State v. Johnson, 458 So.2d 937, 942 (La.App. 1st Cir.1984), writ denied, 463 So.2d 593 (La. 1985), as follows:
To further put this definition in perspective, and as indicated in the above *457 quote, clear and convincing evidence requires more proof than a `preponderance of the evidence.' A preponderance of the evidence has been defined as follows:
A preponderance of the evidence means evidence of greater weight or evidence which is more convincing than that offered in opposition to it.
. . . . .
And clear and convincing evidence is less than `beyond a reasonable doubt.' `Beyond a reasonable doubt' has been defined as follows:
A reasonable doubt is not a mere possible doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable man would seriously entertain. It is a serious doubt, for which you could give good reason.
[Citation omitted.]
The clear and convincing standard of proof is usually applied when there is a special danger of deception, or when a particular type of claim is disfavored on public policy grounds. Succession of Lyons, 452 So.2d at 1165.

Proof of Nunez's Liability
The trial court held that "Nunez clearly violated the trust that the company placed in him" and "clearly knew that what he was doing was in violation of his company's policies" but held that ODECO did not prove fraud by clear and convincing evidence and could not recover.[1] A contract is formed by the consent of the parties. La. C.C. art. 1927. The legal relationship between ODECO and Nunez was a contract of employment. The essential elements of an employment contract are (1) consent, (2) giving of services (labor), and (3) a fixed price. La.C.C. arts. 163, 164, 2669, 2673 and 2675; Vining v. Bardwell, 482 So.2d 685 (La.App. 1st Cir.1985), writ denied, 487 So.2d 439 (La.1986). Consent to a contract may be vitiated by fraud. La.C.C. art. 1948. When consent to a contract has been vitiated by fraud, the contract may be rescinded in an action for annulment. La.C. C. art. 2029, et seq. The instant case is not an action to annul the employment contract between ODECO and Nunez; that contract was terminated in 1985. The essence of the cause of action primarily asserted in this suit is that Nunez violated his contractual duty of fidelity to ODECO and caused damage. While fraud is an essential element of an action to nullify a contract on that ground, it is not an essential element in a cause of action involving a breach of a contractual duty of fidelity. Failure to prove fraud[2] was not fatal to ODECO's recovery herein. The trial court's ruling to the contrary was an error of law.[3]

Proof of Damages
The trial court held ODECO could not recover because it failed to prove its *458 damages by clear and convincing evidence. The holding is wrong as a matter of law. In Hall v. Arkansas-Louisiana Gas Company, 368 So.2d 984, 991 (La.1979), appears the following:
Actual damages arising from a breach of contract must be proven; they cannot be merely speculative or conjectural.... It must appear reasonably certain that the amount of damages rests upon a certain basis.... Such proof need be only by a preponderance of the evidence; proof by direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows that the facts or causation sought to be proved is more probable than not.... The sufficiency of proof of damages must be determined in relation to the particular contract at issue and the circumstances surrounding its breach. The question of the certainty of proof of damages becomes a matter for decision in each individual case.
[Citations omitted.]

Conclusion
This assignment of error has merit.

STANDARD OF APPELLATE REVIEW OF FACTS
The trial court's legal errors have interdicted its factual findings on liability and damages. In Moore v. Clark, 517 So. 2d 293, 302 (La.App. 1st Cir.1987), appears the following:
However, because Louisiana appellate courts have jurisdiction over the facts in a civil case, such prejudicial errors do not necessarily require a remand.... Ordinarily, trial court findings of fact are reviewed on appeal under the manifest error (clearly wrong) standard.... However, where one or more trial court legal errors interdict the trial court's fact-finding process, the manifest error (clearly wrong) standard is no longer applicable, and, if the record is otherwise complete, the appellate court can make its own independent (de novo) review of the record and determine a preponderance of the evidence.... However, where the weight of the evidence is nearly equal and a firsthand view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial.
[Citations omitted.]
The factual issues in this case concern the sufficiency of the evidence; there is very little, if any, conflicting evidence. Accordingly, a remand is not necessary and we will proceed to make our own independent review of the record and determine a preponderance of the evidence.

LIABILITY OF NUNEZ

(Assignments of Error Numbers 1 and 4)
ODECO contends the trial court "erred in finding insufficient evidence to prove fraud or breach of fiduciary responsibility on the part of Defendant" and "erred in exonerating Defendant from his fraudulent acts on the basis that his supervisors initialed some of the invoices initiated by Defendant through which payments were made to Defendant's companies."
ODECO filed in evidence a request for admission of facts directed to Nunez and Nunez's answers thereto. In his answers, Nunez made the following admissions: (1) in 1976, he formed Dixie Generator Rentals, Inc.; (2) his name did not appear in the formal incorporation papers of Dixie because he wanted to conceal his involvement and ownership interest in Dixie from ODECO; (3) although he did not appear on the Articles of Incorporation or as an officer of Dixie, he was directly responsible for overseeing the operation of Dixie during the period from 1976 to 1985; (4) he did not report his ownership interest in Dixie to his supervisors at ODECO because he knew it was against ODECO's conflict of interest policy; (5) he formed Dynamic in 1978 for the purpose of repairing navigational aids for ODECO; (6) he arranged to have Clara Braquet named as president of Dynamic and had stock issued in her name which she assigned back to him; (7) Braquet signed all the incorporation papers for Dynamic, and he [Nunez] made all arrangements for the formation of Dynamic; (8) prior to the *459 formation of Dynamic, Alvin Benjamin, through his company, Benco, approached Nunez and indicated that he wanted his company to do repair work for ODECO; (9) Nunez told Benjamin that he was forming his own repair business and that Benjamin could do repair work for his business; (10) Benco was the company which actually performed the repair work on the ODECO navigational aids sent to Dynamic.
Odeco also filed into evidence a copy of Ocean Drilling & Exploration Company's maintenance foreman position guide. The guide lists the specific objectives and responsibilities of a maintenance foreman. The list contains, in pertinent part, the following duties:
4. Controls repair costs on mechanical and electrical equipment always striving to operate safely for the minimum amount of expenditure.
5. Originates, approves and/or recommends approval of Requisitions and Service and Repair Orders needed in his operation.
In addition, ODECO filed into evidence numerous service and repair orders which were authorized by Nunez.
Nunez gave the following pertinent testimony at the trial:
"Q When you became a supervisor, were you responsible for seeing that other mechanics kept up the equipment on the offshore platforms?
"A Yes, sir.
"Q And they would report to you?
"A Yes, sir.
"Q And if a piece of equipment broke down such as a navigational aid that needed to be repaired, you were responsible for seeing that those repairs were carried out?
"A Yes, sir.
"Q If a piece of equipment needed to be sent in to a manufacturer or a third party to be repaired rather than being repaired by your mechanics, were you responsible for seeing that this equipment went to a particular company for repairs?
"A With the exception that the mechanic on duty could decide what company it was going to. Yes, sir.
"Q You had to approve that, didn't you?
"A Yes, sir.
. . . .
"Q And that was part of your job to see that ODECO Oil & Gas Company, and before that Ocean Drilling & Exploration Company, got the best price and the best work?
"A Yes, sir.
. . . .
"Q Is it your testimony that you had nothing to do with making arrangements for ODECO to rent generators from Dixie?
"A Oh, yes, I did. I had made arrangements because I was the one that rented sometimes rented generators. And so I didI did make arrangements whenever it was needed to rent them from Bobby Miller.
. . . .
"Q Now, the next question I asked you, referring again to your deposition at line fifteen, page sixty-two, "But you were responsible for seeing that generators were rented by ODECO?" And your answer, "Oh, yes, sir, yeah." Next question, "You were the authorizing party for ODECO?" Your answer, "Yes, sir." Next question, "So you would just place the order with yourself, in effect, didn't you?" Answer, "Yes. I would call and get them sent out to wherever we needed one."
Now, you have heard the questions and your answers. Do you agree with the testimony you gave then?
"A Yes, sir, except that the field foremen is the people who notified me when they needed a generator or they notified Dixie Generator, Bobby Miller, one of us, either one or the other of us would be notified, and the generator would be sent out to them.
. . . .
"Q You formed a company called Dynamic Electronics, didn't you?
*460 "A Yes, sir.
"Q And that was in 1978, wasn't it?
"A Yes, sir.
"Q That company did business with ODECO, didn't it?
"A Yes, sir.
"Q And you thought that was a conflict of interest, didn't you?
"A Yes, sir.
"Q You formed a company named Dixie Generator Rentals, didn't you?
"A Yes, sir.
"Q That was in 1976, wasn't it?
"A Yes, sir.
"Q And when you formed that company you knew that was in violation of the conflict of interest, didn't you?
"A Yes, sir.
"Q Those two companies did business with ODECO, Dixie from 1976 until 1985, and Dynamics from 1978 to 1985, didn't they?
"A Yes, sir.
"Q And during that entire period of time that was a conflict of interest for you, wasn't it?
"A (Witness Nods Head Affirmatively)
"Q Would you speak up, please.
"A Yes, sir.
. . . .
"Q Isn't it a fact, Mr. Nunez, that after you started Dixie Generator Rentals, whenever Dixiewhenever ODECO needed a generator, if Dixie had one of the size that ODECO needed, Dixie would get that business?
"A Yes, sir. Dixie would because they was the people with less cost and ODECOless money was the only reason it was being used, costing ODECO less money.
"Q And you were the person responsible to seeing to that, weren't you?
"A That it was less? Yes, sir.
"Q And they were getting the business, Dixie was getting the business?
"A Not all of it. No, sir.
"Q Not all of what?
"A Not all of the business. No, sir.
"Q Let's clarify that. Isn't it correct, again, that whenever ODECO needed a generator if Dixie had a generator of that size Dixie got the business?
. . . .
"EXAMINATION BY MR. CHRISTY:
"Q Just to clarify, Mr. Nunez, page sixty-four, line seven of your deposition, you were asked the question, "So you started placing all of your generator rental business for ODECO through Dixie?" Your answer, "The ones that I was able to handle. Now some generators that were needed, larger generators that were needed that we didn't have, then we would get them from other companies."
Do you recall me asking you that question and you giving that answer?
"A Yes, sir.
"Q Do you agree with the testimony I have just read?
"A Yes, sir.
"Q Now, your first generator was, I believe you testified, thirty kilowatt generator?
"A Yes, sir.
"Q Did Dixie acquire additional generators as the years went on?
"A Yes, sir.
"Q Did you, in turn, lease these generators out to ODECO?
"A Yes, sir, and other parties.
"Q But ODECO was the primary customer, were they not?
"A I guess they probably were.
"Q Okay. And you basically continued this process all the way up to August 1985, didn't you?
"A Yes, sir.
. . . .
"Q Did you ever tell anyone at ODECO that you had an interest in Dixie Generator Rentals?
"A No, sir.
. . . .
*461 "Q While you're up, let me show you Plaintiff's Exhibit 8. This is another set of documents, ODECO cash voucher, Dixie Generator Rentals invoice dated October 1, 1978I'm sorry. There are two invoices attached. One is dated October 1, 1977, and the other is dated December 1, 1977, and the thirdand the fourth page is an SRO issued to Dixie Generator Rentals on September 6th, 1977, and it's signed by M.J. Nunez. Do you recognize your signature?
"A Yes, sir.
"Q Did you authorize ODECO to rent from Dixie one, one hundred kW generator skid mounted?
"A Yes, sir.
. . . .
"Q Mr. Nunez, another one of the companies that is the subject of the lawsuit is Dynamic Electronics. You owned that company, too, did you not?
"A Yes, sir.
. . . .
"Q Before Dynamic Electronics went into business, how didhow did ODECO handle the repair of navigational aids?
"A Through the other two companies, Automatic Power and Tideland Signal.
"Q After Dynamic was put into business by you, you started giving that business to Dynamic, did you not?
"A No, sir, not all of it, because some of it was still sent to Tideland Signal and some of it was still sent to Automatic Power. Not all of it.
"Q Is it correct that there was some work that had to be sent to those companies because they were the manufacturers of the items?
"A Yes, sir. There was a lot of times that they wouldn't furnish you with parts because it was something that was special that they had that they wanted to keep in their company. So the specialized items went to them.
. . . .
"Q Well, during the entire period that Dynamic was doing business with ODECO, no ODECO representatives were aware of your involvement with Dynamic; is that correct?
"A No, sir.
. . . .
"Q You felt like you were doing ODECO a favor by using Dynamic?
"A No, sir, not a favor. I felt like I was protecting my interest in ODECO.
"Q Your interest in ODECO?
"A Uh-huh. (Affirmative Response)
"Q How were you protecting your interest in ODECO?
"A Well, I had stock and I had a savings plan and I thought that every buck you save is a buck that's gained.
"Q And you were also feathering a nest for your retirement years, weren't you?
"A Yes. That's right. I was."
The contract of employment between ODECO and Nunez created a master-servant relationship. Nunez was the type of servant who hired out his services in consideration of certain wages. La.C.C. arts. 163 and 164(1).[4] The general rules controlling this type of master-servant employment contract are found in Title IX of the Civil Code pertaining to leases. La.C.C. arts. 164 and 2668 et seq. Chapter 3 of Title IX has specific rules for leases of labor and industry. La.C.C. art. 2745 et seq. A lease of labor (employment contract) is a synallagmatic contract based on mutual consent by which one party (the servant or employee) gives to the other (master or employer) his labor (services) at a fixed price. La.C.C. arts. 2669, 2670, 2673 and 2675. The code articles on this contractual relationship do not address the *462 duty of fidelity owed by an employee to his employer.
The evidence indicates that Nunez acted as a mandatary (agent) for ODECO for certain transactions. A contract of mandate occurs when a person (the principalsuch as ODECO), gives another person (the mandatarysuch as Nunez) the power to transact one or more affairs in his (the principal's) name. La.C.C. art. 2985; Bank of Greensburg v. Forrest, 520 So.2d 728 (La.1988). The general rules controlling the principal-mandatary contract are found in Title XV of the Civil Code. La.C. C. art. 2985 et seq. A contract of mandate (agency) is distinguishable from a master-servant employment contract because it may be gratuitous, La.C.C. art. 2991, and an employment contract is not, and the mandatary has the authority to act in the name of the principal, whereas the employee does not have that power. However, a mandatary may also be an employee, such as was Nunez. Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968). A mandatary's duty of fidelity is set forth in La.C.C. arts. 3002-3015. In particular, La.C.C. arts. 3002 and 3003 provide as follows:
Art. 3002. The attorney in fact is bound to discharge the functions of the procuration, as long as he continues to hold it, and is responsible to his principal for the damages that may result from the non-performance of his duty.
He is bound even to complete a thing which had been commenced at the time of the principal's death, if any danger result from delay.
Art. 3003. The attorney is responsible, not only for unfaithfulness in his management, but also for his fault or neglect.
Nevertheless, the responsibility with respect to faults, is enforced less rigorously against the mandatary acting gratuitously, than against him who receives a reward.
This court has defined the duty of fidelity owed by employees and/or mandataries (agents) to their employers and/or principals in Realty Mart, Inc. v. Greenwell Commercial Properties, Inc., 343 So.2d 459, 461-462 (La.App. 1st Cir.), writ denied, 345 So.2d 902 (La.1977), as follows:
Wicker was hired by the defendants as their agent in this matter. As such, he is charged with certain responsibilities. In Texana Oil & Refining Co. v. Belchic, 150 La. 88, 90 So. 522 (1922), quoting U.S. v. Carter, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769 [(1910)], the Supreme Court of Louisiana has said:
"`The employee is duty bound not to act in antagonism or opposition to the interest of the employer. Every one, whether designated agent, trustee, servant, or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose, must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law. The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his service. He may not speculate for his gain in the subject-matter of his employment. He may not use any information that he may have acquired by reason of his employment either for the purpose of acquiring property or doing any other act which is in opposition to his principal's interests. He will be required to account to his employer for any gift, gratuity, or benefit received by him in violation of his duty, or any interest acquired adverse to his principal without a full disclosure, though it does not appear that the principal has suffered any actual loss by fraud or otherwise.' 21 R.C.L. 825, § 10.
"The Supreme Court of the United States has said:
`It is not enough for one occupying a confidential position who is shown to have secretly received a benefit from the opposite party to say, `You cannot *463 show any fraud,' or `You cannot show that you have sustained any loss from my conduct.' Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerous precedent to lay down as law that, unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his agency..."
[Bolding added.]
See also Neal v. Daniels, 217 La. 679, 47 So.2d 44 (1950); Robinson v. Commercial Cattle Co., 82 So.2d 108 (La.App. 1st Cir. 1955); McDonald v. O'Meara, 473 F.2d 799 (5th Cir.), cert. denied, 412 U.S. 906, 93 S.Ct. 2293, 36 L.Ed.2d 971 (1973).
In Dufau v. Creole Engineering, Inc., 465 So.2d 752 (La.App. 5th Cir.), writ denied, 468 So.2d 1207 (La.1985), an employee (who was a salesman) brought suit against his employer for unpaid commissions and expenses. The employer reconvened for damages asserting causes of action for breach of the employment contract, breach of the employee's fiduciary duty owed to the employer and violation of the Louisiana Unfair Trade Practices Act. The operative facts of the employer's claim against the salesman-employee are set forth in Dufau, 465 So.2d at 756, as follows:
Dufau resigned from Creole on December 21, 1981. However, while he was still employed by Creole during 1981, Dufau organized a sole proprietorship named the Pump & Valve Company ("Pump & Valve"). Dufau opened a checking account in the name of Pump & Valve Company in September, 1981, and had business cards printed. In September, 1981, and thereafter during his employment with Creole, Dufau, on behalf of Pump & Valve, obtained orders from Red Fox, Brown & Root, and Transwater Marine. These orders were for pumps, and other products Creole had been selling to these customers. During the period from September, 1981, to December, 1981, while he was employed by Creole, Dufau accepted for Pump & Valve from Creole's customers orders in excess of $89,000. These products otherwise would have been purchased from Creole. Creole contends that they would have realized gross profits totalling $41,809.52 on these sales.
. . . .
In January, 1982, Creole discovered that Dufau not only had set up his own business in direct competition with Creole, but had actually done so while still employed by Creole. Furthermore, Creole discovered that, prior to his resignation, Dufau had diverted business from Creole's customers to his new company. Until this discovery, Creole had no reason to believe that it had not been represented in the territory assigned Dufau, or that it had been effectively eliminated from competition in that territory by its own employee.
The trial court found that the employee was guilty of unfair methods of competition and awarded the employer $41,809.52 on its reconventional demand. On appeal, this award was affirmed with the following rationale found at Dufau, 465 So.2d at 758:
The solicitation and diversion of an employer's customers prior to termination constitutes unfair competition entitling the plaintiff to recover damages. As stated by the trial court, "an employee owes his employer a duty to be loyal and faithful to the employer's interest in business".
The entire record indicates Dufau's problems and frustrations with Creole however, his actions of placing the business in his company while still employed by Creole can't be condoned.
Creole's expert witness, Paul Forsyth[,] testified that the gross profits that Creole would have realized on the diverted sales would have been $41,809.52. This was suggested through documentation showing the standard costs and profits for the sales at issue.
. . . . The definition of unfair trade practices is left up to the courts. In Coffey v. Peoples Mortgage & Loan of Shreveport, *464 Inc., 408 So.2d 1153 (La.App. 2nd Cir.1981) the court stated:
"[A] practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."
Therefore, this court finds that in order for Creole to recover under the Louisiana Unfair Trade Practices Act, Creole must prove some element of fraud, misrepresentation, deception, or other unethical conduct on the part of Dufau. The trial court felt these facts of the business deception were proven by a preponderance of the evidence and we see no manifest error in his conclusion....
The trial court awarded Creole $41,809.52 on its reconventional claim. The court's Reasons for Judgment are void of any reference as to what the figure totally represents. We hold that not only did Dufau violate the Unfair Trade Practices Act, there was an obvious breach of fiduciary duty owed to Creole.
[Bolding added.] [Citation omitted.]
The principles set forth in Realty Mart, Inc. and Dufau are applicable to the instant case. Nunez owed a duty of loyalty and fidelity to his employer and principal, ODECO, and he could not lawfully serve or acquire any interest of his own in opposition to it. After reviewing the evidence, we conclude that the trial court judge was correct when he found as a fact that Nunez "violated the trust that the company placed in him." The evidence overwhelmingly shows that Nunez breached his contractual duty of fidelity and loyalty owed to ODECO.
Ratification in the law of agency is the adoption by one person of an act done on his behalf by another without authority. Roberson Advertising Service, Inc. v. Winnfield Life Insurance Company, 453 So.2d 662 (La.App. 5th Cir.1984); Bamber Contractors, Inc. v. Morrison Engineering & Contracting Company, Inc., 385 So.2d 327 (La.App. 1st Cir.1980). In order for ratification to occur, the person to be bound must, with full knowledge of all material facts, express an interest to adopt the unauthorized acts. Collins Dozer Service, Inc. v. Gibbs, 502 So.2d 1174 (La.App. 3rd Cir.), writ denied, 504 So.2d 881 (La. 1987); Joseph v. Greater New Guide Baptist Church, Inc., 194 So.2d 127 (La.App. 1st Cir.1966), writ denied, 250 La. 379, 195 So.2d 647 (1967).
The record is devoid of facts which show ODECO ratified the acts of Nunez. At trial, Nunez admitted that no one at ODECO was aware of his ownership in Dixie and Dynamic. Although Nunez's supervisors approved many of the invoices for generator rentals and navigational aid repairs submitted to them by Nunez, there is no evidence whatsoever showing that the supervisors knew that Nunez had an interest in the companies on the invoices. ODECO did not ratify the acts of Nunez.
These assignments of error have merit.

DAMAGES

(Assignment of Error Number 2)
ODECO contends the trial court committed error in finding there was insufficient evidence to prove damages.
As previously indicated, ODECO had the burden of proving its damages by a preponderance of the evidence. The sufficiency of the proof is determined in relation to the particular contract at issue and the circumstances surrounding the breach. Nunez is liable for the damages caused by his defective performance of his obligation of fidelity to ODECO. La.C.C. art. 1994. ODECO's damages are measured by the loss it sustained and the profit of which it was deprived. La.C.C. art. 1995.
B. Ray Mize, Jr., a C.P.A. and manager of internal audit at ODECO, testified about ODECO's damages. To calculate the damages resulting from the transactions with Dixie, Mize compared Dixie's actual charges to ODECO with similar charges which Castay, Inc. would have made for the same type of generators, for the same length of time, and at the same point in time. Castay was used in the comparison because ODECO had rented generators from Castay in the past and it was a present supplier. Nunez had indicated that *465 he used Castay's price lists to establish the Dixie price structure. Mize concluded that Dixie had overcharged ODECO by $79,951. This amount represents the difference between what ODECO paid for Dixie's services versus what ODECO would have paid for those same services had Nunez used Castay for generator rentals instead of his own company.
To calculate the damages resulting from the transactions with Dynamic, Mize calculated the difference between what ODECO paid Dynamic for repairs to the navigational aids and what Benco charged Dynamic for those same repairs. Mize testified that Dynamic charged ODECO $502,785 for the repairs, Benco charged Dynamic $106,290 for those same repairs, and the difference (or profit to Dynamic) was $396,495. Mize further testified that the difference represents the amount of damages owed to ODECO by Nunez because Benco performed all of the repairs. Dynamic did nothing whatsoever to the navigational aids other than picking them up from and returning them to ODECO.
ODECO presented sufficient evidence to show the damage it sustained as a result of Nunez's breach of duty. ODECO is entitled to damages in the amount of $476,446 ($79,951 for overcharges by Dixie and $396,495 for overcharges by Dynamic).
This assignment of error has merit.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered herein in favor of ODECO and against Nunez in the sum of $476,446, with legal interest thereon from date of judicial demand until paid,[5] and for all costs of these proceedings. It is further ordered and decreed that the writ of attachment issued herein be maintained[6] and that the lien and privilege resulting from the attachment upon the check payable to Marcel J. Nunez issued by the Whitney National Bank of New Orleans in the sum of $37,025.13 and the stock certificate for 1,320 shares of common stock of Ocean Drilling & Exploration Company be recognized.
REVERSED AND RENDERED.
NOTES
[1] These reasons for judgment seem to say that, although Nunez breached his duty of fidelity to ODECO, this breach is not actionable because it was not fraudulent.
[2] Fraud is defined in La.C.C. art. 1953 as follows:

Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
ODECO makes a strong argument that fraud was proven herein; however, it is unnecessary to rule on that issue because ODECO is clearly entitled to recover on another cause of action.
[3] Prior to January 1, 1985, the jurisprudence held that fraud had to be proven by clear and convincing evidence. Marcello v. Bussiere, 284 So.2d 892 (La.1973); Hoover v. Mid-South Exploration Company, Inc., 479 So.2d 551 (La.App. 1st Cir.1985). By Act 331 of 1984, effective January 1, 1985, La.C.C. art. 1957 was enacted which provides as follows:

Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence.
ODECO's causes of action against Nunez continued to accrue until August of 1985, and this suit was not filed until October 29, 1985. If the standard of proof of La.C.C. art. 1957 can be applied retroactively to facts which occurred prior to January 1, 1985, (is La.C.C. art. 1957 substantive or procedural), then the trial court also committed legal error by holding ODECO had to prove fraud by clear and convincing evidence. See, for example, Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2nd Cir.), writ denied, 506 So.2d 1231 (La.1987); Ordner v. Fire Insurance Co. of Quaker City, 467 So.2d 619 (La.App. 3rd Cir.1985).
[4] La.C.C. art. 164(2) and (3) pertain to indentured servants and apprentices. T. Tucker, Sources of Louisiana's Law of Persons: Blackstone, Domat, and the French Codes, 44 Tul.L. Rev. 264 (1970); Note, Master and Servant Employment ContractsLetting and Hiring of ServicesSale of ServicesArticles 164, 167, Louisiana Civil Code of 1870, 13 Tul.L.Rev. 467 (1939).
[5] Although ODECO asserts causes of action in tort and contract, this action is primarily a suit in contract, and we have decided it on that basis. Generally, contractual debts (damages) bear interest from their due dates. La.C.C. art. 2000. Although ODECO's damages accrued prior to the time that judicial demand was made (suit was filed), ODECO only prayed for interest from date of judicial demand. Legal interest can only be awarded as it is prayed for. La.C.C. P. art. 1921; Landry v. Louisiana Hospital Service, Inc., 449 So.2d 584 (La.App. 1st Cir.1984).
[6] By taking a suspensive appeal, ODECO preserved its rights in the writ of attachment. Cf. South Street Lumber Company v. Dickerson, 235 La. 1062, 106 So.2d 513 (1958); Smith v. Utility & Maintenance Contractors of America, Inc., 301 So.2d 906 (La.App. 2nd Cir.1974); writ denied, 305 So.2d 539 (La.1975); J. Johnson, Attachment and Sequestration: Provisional Remedies Under the Louisiana Code of Civil Procedure, 38 Tul.L.Rev. 1 (1963).