WILLIAMS, J.
|,The plaintiffs, William Norwood, Jennifer Norwood and Norwood Minerals, L.L.C., appeal a judgment in favor of the defendants, Mobley Valve Services, Inc., Mark Mobley and Kimberly Mobley. The trial court found that the plaintiffs had not been over billed and that although the defendants had breached a fiduciary duty in one aspect of the transaction, the plaintiffs failed to prove they were damaged as a result. On appeal, the defendants filed a peremptory exception of prescription and plaintiffs filed a motion to remand, but only if this court was inclined to sustain the exception. For the following reasons, we deny the exception of prescription, reverse and render.
FACTS
In February 2005, William and Jennifer Norwood met with Mark Mobley to discuss a possible investment opportunity. Mark Mobley explained that the Norwoods could obtain a working interest in a mineral lease covering 878 acres in DeSoto Parish. The lessee, Mobley Valve Services, Inc. (“MVS”), was the operator of the lease. Mark Mobley was the sole shareholder of MVS and his wife, Kimberly Mobley, was an officer of the corporation. MVS provided the Norwoods with an estimate of the costs to drill wells under the lease based on the drilling of an initial well. The Norwoods paid $39,925 to purchase a 10% working interest in the lease. This interest excluded the completed Hunter-Man-nies No. 1 Well and was not recorded.
In April 2005, drilling commenced for seven additional wells under the lease. For each well, MVS provided to the Nor-woods an Authorization |2for Expenditure (“AFE”) listing the costs and expenses. In April 2005, the Norwoods received for Hunter-Mannies #2, the first well in which they participated, a Drilling AFE *1147 for $278,135 and a Completion AFE for $192,885. The Drilling AFE included a charge for the estimated costs of “overhead & mgnt.” The Norwoods were invoiced for 10% of these amounts, which they paid. In September 2005, MVS sent the Norwoods a check for $3,133.50 and a letter stating that the amount was “a refund of all excess funds from the AFE” for the Hunter-Mannies # 2 well. Over time, the Norwoods and their company, Nor-wood Minerals, L.L.C. (“NML”), paid $608,978 in estimated costs under the lease, but they did not receive any other refunds.

First Lanza Deal

In June 2006, the Norwoods and Mob-leys agreed to transfer their interests in the lease to J.A. Lanza, L.L.C. (the “First Lanza Deal”). The Norwoods assigned their interest in the lease to MVS, which negotiated with Lanza. On October 6, 2006, the First Lanza Deal transferred the lease interests of MVS and the Norwoods to Lanza in return for cash payments and an option to participate up to 25% in future drills from the surface to 4,100 feet and an option up to 9.375% in new- drills below 4,150 feet. On October 18, 2006, a document titled “Sale Arrangements and Terms for Hunter-Mannies No. 2 thru Hunter-Mannies No. 8” was signed by William Norwood for NML and by Mark Mobley for MVS. The document stated the price of $2,750,000 for the wells and that NML will have up to a 25% option on all new drills 0 to 4,100’ and up to a 9.375% option on all new |sdrills 4,150' to final depth.
At the time, MVS owned 50% of the shallow rights and 37.5% of the deep rights under the lease. Jones Energy, LLC, owned by Marshall Jones, and Denergy Exploration, LLC, owned by Dan Newman, collectively held a 25% working interest in the lease. In September 2006, Jones and Newman filed a lawsuit alleging misconduct by MVS in operating the lease (“Jones lawsuit”). The Sage Trust, which held a 25% interest in the lease, intervened to make the same allegations. Thereafter, the Jones lawsuit was concluded by a settlement in which Jones and Newman transferred their 25% lease interest to Lanza and MVS bought the 25% lease interest of the Sage Trust.

Second Lanza Deal

As a result of the Jones lawsuit, MVS suspended revenue payments to Lanza, who then ceased making payments under the First Lanza Deal. This situation led to litigation between Lanza and Mobley. In August 2007, this litigation was settled through a revised agreement (“Second Lanza Deal”). Under the agreement, MVS conveyed to Lanza a 75% working interest in the Hunter-Mannies lease from the surface through the Glen Rose formation and a 37.5% lease interest as to depths below the Glen Rose formation. The Second Lanza deal modified the well participation option rights, providing that Mobley shall have the right as to future wells to purchase a one-eighth (12.5%) working interest by payment of the proportionate cost of drilling and completion of the wells.
After this Second Lanza Deal was completed, the Mobleys presented [4the Nor-woods -with a document stating that they would be paid in monthly installments and that the Mobleys and' Norwoods would split a 12.5% option in all depths. The Norwoods did not sign this document and they received 10% of the payments by Lanza under this deal.
Some time later, Lanza sought to acquire the option rights of MVS and the Norwoods retained in the Second Lanza Deal. Although MVS initially sought the price of $500,000 for the option rights, MVS eventually sold the option rights to *1148 Lanza for $150,000, plus Lanza’s full and immediate payment of all remaining sums due under the Second Lanza Deal. The Norwoods received their 10% share of the price for the option rights and the Lanza payments, for a total of $76,065.
The sale, or waiver, of the 12.5% option enabled MVS and Lanza to sell the deep rights, defined as depths below 9,000 feet, in the Hunter-Mannies lease to Chesapeake Louisiana, L.P. (“Chesapeake”). In June 2008, Chesapeake paid MVS and Lanza a bonus of $17,500 per net mineral acre for the mineral lease rights. MVS received a total of $5,725,091.98 in proceeds. The Mobleys did not inform the Norwoods about the pending Chesapeake deal.
Subsequently, the plaintiffs, William Norwood, Jennifer Norwood and Norwood Minerals, L.L.C., filed a petition for damages against the defendants, Mobley Valve Services, Inc., Mark Mobley and Kimberly Mobley. Plaintiffs alleged that defendants were liable for fraud, breach of contract, failure to give an accounting, use of the corporation as an alter ego and intentional interference with contract. After a trial, the court issued a ^written opinion finding that plaintiffs failed to show that they were overcharged for operating expenses. The trial court also found that defendants breached their fiduciary duty to plaintiffs by failing to disclose,a pending transfer of Haynesville Shale interests under the lease to Chesapeake prior to the sale of plaintiffs’ share of the well participation option rights. However, the court concluded that the plaintiffs failed to establish they were damaged by the breach because there was “no evidence” of the actual fair value of the options sold. The court rendered judgment dismissing the plaintiffs’ claims. The plaintiffs appeal the judgment.
DISCUSSION
On appeal, the defendants filed a peremptory exception of prescription. At oral argument, this court referred consideration of the exception to the merits of the appeal and the parties then submitted supplemental briefs on the issue of prescription. Defendants argue that the plaintiffs’ claims have prescribed because a one-year prescriptive period is applicable in this case.
Delictual actions are subject to a liberative prescription of one year, running from the day injury or damage is sustained. LSA-C.C. art. 3492. An action on a contract is governed by the prescriptive period of ten years for personal actions. LSA-C.C. art. 3499. The nature of the duty breached determines whether an action is in tort or contract. Roger v. Du-frene, 613 So.2d 947 (La.1993); Kroger Co. v. L.G. Barcus & Sons, Inc., 44,200 (La. App.2d Cir.6/17/09), 13 So.3d 1232. The distinction between damages ex contractu and damages ex delicto is that the former flow from the breach of La special obligation contractually assumed by the obli-gor, whereas the latter flow from the violation of a general duty owed to all persons. Kroger, supra; Trinity Universal Insurance Co. v. Horton, 33,157 (La.App.2d Cir.4/5/00), 756 So.2d 637.
Here, the record shows that the plaintiffs agreed to pay 10% of the drilling expenses and to receive 10% of the revenue generated as a result of Mark Mob-ley’s management of their lease interest. Plaintiffs allege in their petition that defendants breached the parties’ agreement by improperly billing plaintiffs for charges in excess of the actual cost to MVS for drilling and by depriving plaintiffs of their opportunity to exercise their option rights without disclosure of the pending sale to Chesapeake. After trial, the district court found that defendants had breached their *1149 fiduciary duty arising from their agreement to manage the plaintiffs’ lease rights so as to serve their best interest.
Based upon this record, we conclude that the plaintiffs’ claims involve a breach of the fiduciary obligation contractually assumed by the defendants. Thus, the 10-year prescriptive period applies in this case and the plaintiffs’ petition was timely filed. Consequently, the exception of prescription is denied.

Damages

The plaintiffs contend the trial court erred in failing to award them damages for breach of the defendants’ fiduciary duty. Plaintiffs argue that the profit which defendants obtained by their breach of the fiduciary duty is evidence of plaintiffs’ damages.
|7A mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal. LSA-C.C. art. 2989. The contract of mandate is not required to be in any particular form. Nevertheless, when the law prescribes a certain form for an act, a mandate authorizing the act must be in that form. LSA-C.C. art. 2993. The principal may confer on the mandatary general authority to do whatever is appropriate under the circumstances. LSA-C.C. art. 2994. A mandatary is bound to fulfill with diligence the mandate he has accepted. He is liable for the principal’s loss sustained as a result of the mandatary’s failure to perform. LSA-C.C. art. 3001.
The trial court found that defendants breached their fiduciary duty by failing to disclose to plaintiffs the pending sale to Chesapeake before selling the option rights and that the sale of those options enabled defendants to realize a large financial gain. Although the court found there was no evidence presented of the economic value of those option rights, the record demonstrates that more likely than not Chesapeake would have paid a lower bonus if the lease interest remained subject to such option rights. Regarding the bonus amount, Kim Mobley testified that Chesapeake had reduced a prior offer from $25,000 per acre because of an existing servitude affecting the lease acreage.
Thus, the defendants’ sale of the option rights without prior disclosure not only deprived plaintiffs of an opportunity to possibly negotiate a better price, the removal of the option rights was a factor in Chesapeake’s payment of a lease bonus of $17,500 per net mineral acre, | ^resulting in defendants’ receipt of $5,725,092 for their lease interests. A fiduciary must account to his principal for any benefit received by him in violation of his duty. ODECO Oil & Gas Co. v. Nunez, 532 So.2d 453 (La. App. 1st Cir.1988). The duty imposed on a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. Double-Eight Oil and Gas L.L.C. v. Caruthurs Producing Co., Inc., 41,451 (La.App.2d Cir.11/20/06), 942 So.2d 1279. When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. LSA-C.C. art. 1999.
Here, the defendants’ fiduciary duty arises from an agreement by which plaintiffs were to receive 10% of the money obtained by defendants in managing the plaintiffs’ lease interest. As found by the trial court, defendants sold the option rights in breach of their fiduciary duty to disclose the pending sale with Chesapeake to plaintiffs, thereby receiving the benefit of the lease bonus payments. Thus, the measure of plaintiffs’ damages is their 10% share of the lease bonus proceeds derived from the defendants’ breach of their fidu *1150 ciary duty to plaintiffs. Consequently, the defendants are liable to pay the plaintiffs the amount of $572,509 in damages. We shall render judgment accordingly.

Invoices

The plaintiffs contend the trial court erred in finding that they were not over billed by defendants. Plaintiffs argue they are entitled to a refund of charges that exceeded the actual costs of drilling.
IsAt the request of the principal, or when the circumstances so require, the manda-tary is bound to provide information and render an account of his performance of the mandate. LSA-C.C. art. 3003. A co-owner of a lessee’s interest in a mineral lease may not independently conduct operations without the consent of his co-owner. LSA-R.S. 31:177.
In the present case, Dr. Norwood testified that he understood from his initial meeting with Mark Mobley that plaintiffs would not be charged for management fees or surcharges, but would be charged only for 10% of the actual cost of drilling as shown by charges of third party contractors. Norwood stated that the amounts charged on the AFEs were consistent with Mobley’s initial estimates of the well costs.
Kim Mobley testified that the Norwoods were supposed to pay their 10% share of the AFE charges and that they paid those amounts without complaint. Mobley stated that the Norwoods once received a refund based on lower costs for road construction at one well site.
Thomas Youngblood, who was accepted as an expert in accounting, testified that he prepared a report concerning invoices issued from MVS to MVS for described work, but which did not have backup support from third party sources. Young-blood stated that he subtracted the amount of those invoices from the total costs billed to the Norwoods. Youngblood testified that the result of this calculation showed a balance of $164,409.26 owed to the Norwoods.
The record shows that the plaintiffs were provided with an AFE for each well and paid their pro rata share, indicating that they authorized the | ^expenditures and consented to the operations under the lease. However, the plaintiffs presented expert testimony demonstrating that the defendants were unable to provide supporting documentation for a number of invoices generated by MVS. Thus, defendants failed to perform their obligation under Article- 3003 to provide accurate information regarding the basis for a portion of the drilling costs assessed to plaintiffs. Consequently, plaintiffs are entitled to a refund of their payments for undocumented charges in the amount of $169,409. Fraud
The plaintiffs contend the trial court erred in failing to address the issue of fraud. Plaintiffs argue that defendants committed fraud by their misrepresentation of invoice costs and failure to disclose the Chesapeake transaction.
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss to the other. Fraud may also result from silence or inaction. LSA-C.C. art. 1953. Fraud must be proved by a preponderance of the evidence. LSA-C.C. art. 1957.
Here, Kim Mobley testified that the information for the AFE amounts was provided by Mark Mobley and Mr. Tipton, an engineer. Mobley stated that she also reviewed company records to determine the equipment used and the work performed at the well sites in generating the invoices. Mobley testified that she did not discuss the Chesapeake transaction with the Nor-woods and she did not think the Chesapeake sale involved the interests |nof the *1151 Norwoods. Mobley stated that she gave the Norwoods information about the Second Lanza Deal and that the parties obtained full payment of the amounts in that deal through release of their option rights.
The evidence presented supports a finding that even though there was a lack of documentation for some of the invoices issued by MVS, there was no showing that the drilling operations for the wells were not actually performed. Additionally, the plaintiffs did not prove by a preponderance of evidence that the defendants failed to disclose the Chesapeake sale with the intent to obtain an unjust advantage or to cause a loss to plaintiffs in the sale of the option rights. Thus, plaintiffs failed to satisfy their burden of proving fraud. This assignment of error lacks merit.

Piercing the Corporate Veil

The plaintiffs contend the trial court erred in not finding that defendants used the corporation as an alter ego. Piercing the corporate veil based on the alter ego theory requires consideration of factors including commingling of corporate and shareholder funds, failure to maintain separate bank accounts and failure to follow statutory formalities in transacting corporate affairs. Town of Haynesville, Inc. v. Entergy Corp., 42,019 (La.App.2d Cir.5/2/07), 956 So.2d 192.
In this case, George McGovern was accepted as an expert in accounting and testified that he has prepared the tax returns for the Mobleys and MVS for many years. McGovern stated that he periodically reviewed the records of MVS to properly account for the revenues of the company. He testified that the Mobleys at times had used business accounts to pay [^personal expenses, but that he was able to reconcile such discrepancies to maintain the accounts of MVS and the Mobleys separate from each other.
Based on the evidence presented, the plaintiffs failed to establish that the Mob-leys used MVS as their alter ego. Thus, plaintiffs have not proved sufficient grounds to pierce the corporate veil. This assignment lacks merit.

Intentional Interference with Contract

The plaintiffs contend the trial court erred in failing to find that the Mob-leys intentionally interfered with the contract of MVS. The necessary elements for a claim of intentional interference with a contract are the existence of a contract or a legally protected interest between plaintiff and the corporation, the officer’s knowledge of the contract, the officer must intentionally induce the corporation to breach the contract, absence of justification and damages caused by the breach. Mor-Tem Risk Management Services, Inc. v. Shore, 43,169 (La.App.2d Cir.3/19/08), 978 So.2d 588.
Based on this record, the plaintiffs have failed to identify the acts of the corporate officers that were intended to cause MVS to breach a contract with plaintiffs. As stated above, the Mobleys failed to disclose to plaintiffs a transaction with a third party. However, there is no showing that the lack of disclosure was intended to cause MVS to breach an agreement with plaintiffs. Thus, this assignment of error lacks merit.

Declaratory Relief

The plaintiffs contend the trial court should have rendered judgment declaring that plaintiffs continue to have option rights under the lease. 11¾After reviewing this record, we conclude that to the extent the waiver agreement of June 2008 did not affect the shared option rights of Mobley and Norwood under the Second Lanza Deal of August 31, 2007, then plaintiffs may have rights to participate in future wells. However, the plaintiffs would be required to act to exercise any such *1152 rights at the time a future well is proposed at the specified depths that were not affected by the sale to Lanza. Thus, the plaintiffs have not shown that declaratory relief is appropriate at this time. This assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, the defendants’ exception of prescription is denied and the trial court’s judgment is reversed. Judgment is hereby rendered to award the amounts of $572,509 in damages and $169,409 in reimbursement of costs to the plaintiffs, William Norwood, Jennifer Nor-wood and Norwood Minerals, L.L.C. Costs of this appeal are assessed to the appel-lees, Mobley Valve Services, Inc., Mark Mobley and Kimberly Mobley.
EXCEPTION OF PRESCRIPTION DENIED; REVERSED AND. RENDERED.